[No. S030514. Dec. 24, 1998.]

In re KENNETH EARL GAY on Habeas Corpus.

## COUNSEL

Taylor & Company, Richard Urdan; Marron, Reid & Sheehy and Martin H. Dodd for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan Lee Frierson, William T. Harter, Linda C. Johnson, Robert S. Henry and Lance E. Winters, Deputy Attorneys General, for Respondent.

## OPINION

BAXTER, J.—Petitioner Kenneth Earl Gay was convicted by a jury of the June 1, 1983, first degree murder (Pen. Code, § 189)[1] of Paul Verna, a Los Angeles police officer. The jury found that the murder was an intentional killing of a peace officer engaged in the performance of his duties; that the murder was committed for the purpose of avoiding lawful arrest (§ 190.2, subd. (a)(5)); that a principal was armed with a firearm (§ 12022); and that petitioner personally used a firearm (§§ 12022.5, subd. (a), 1203.06, subd. (a)(1)). The jury returned a penalty verdict of death.

The jury also found petitioner guilty of two counts of attempted robbery (§§ 664/211), ten counts of robbery (§ 211), conspiracy to commit robbery (§ 182), and being an ex-felon in possession of a concealable firearm (§ 12021). He was found to have personally used a firearm in committing three of those offenses (§§ 12022.5, 1203.06, subd. (a)) and to have inflicted great bodily injury on two of the robbery victims (§ 12022.7).

This court reversed the attempted robbery, robbery, and conspiracy to commit robbery convictions on the basis of prejudicial instructional error, but otherwise affirmed the judgment and sentence of death on April 29, 1993. (*People* v. *Cummings* (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1].)[2]

While his appeal from the judgment was pending, petitioner filed this petition for writ of habeas corpus.[3] The petition challenges the validity of the judgment on several grounds. A claim of ineffective assistance of counsel is the principal focus of the petition for writ of habeas corpus.[4] After review of the petition and accompanying exhibits, this court issued an order to show

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

[2] Among the claims made by petitioner on appeal was a claim that he had received constitutionally inadequate representation by his attorney, Daye Shinn. That claim was rejected as to some claims because the record on appeal was not an adequate basis on which to determine whether Shinn had sound tactical reasons for the acts and omissions on which the ineffective counsel claim was predicated and, as to other claims, because no prejudice was demonstrated. (See *People* v. *Cummings, supra,* 4 Cal.4th at pp. 1339-1343.)

[3] While the petition for writ of habeas corpus is not presumptively timely (Supreme Ct. Policies Regarding Cases Arising from Judgments of Death, Std. 1-1.2), the court concluded that the delay was adequately explained and justified on the basis of Shinn's refusal to cooperate with habeas corpus counsel and destruction and loss of records, and present counsel's showing of diligence in attempting to promptly locate witnesses.

[4] Petitioner also alleged: claim II—he did not receive the assistance of a competent mental health professional; claim III—he was denied due process and the opportunity to defend against aggravating evidence because the prosecution did not give adequate notice of the evidence to be introduced at the penalty phase of the trial; claim IV—he was denied due process by an eight-day adjournment of the trial immediately before jury deliberations; claim

cause ordering respondent Director of Corrections to show cause why the penalty of death should not be set aside on the ground that petitioner had received constitutionally ineffective assistance by trial counsel, Daye Shinn,[5] at the penalty phase of the trial.[6]

After consideration of the record on appeal, the evidence presented at the habeas corpus evidentiary hearing, and the findings of the referee, we conclude that petitioner did not receive constitutionally adequate representation at the penalty phase of the trial. While we cannot say with certainty that the result would have been more favorable to petitioner had he been represented by competent counsel, neither can we have confidence in a penalty verdict rendered after a trial in which counsel for defendant defrauded both the court and his client and ill served his client in the manner demonstrated by this record. We shall, therefore, grant the petition for writ of habeas corpus and remand petitioner to the superior court for a new penalty trial.

## I

### Background

Officer Verna was shot and killed by petitioner and his crime partner Raynard Paul Cummings when Verna stopped the car in which they were

V—evidence whose prejudicial impact outweighed its probative value was introduced against him; claim VI—the presence of uniformed officers in the courtroom as spectators had a prejudicial impact on the jury; claim VII—he was denied his state and federal constitutional rights to trial before a jury drawn from a representative cross-section of the population; claim VIII asserted that petitioner's colorable claim of factual innocence entitled him to habeas corpus relief; claim IX asserted that the cumulative effect of the errors demonstrated was so prejudicial as to require reversal of the conviction and judgment.

To the extent that it is not relevant to the claim of ineffective counsel, claim II is rejected on the merits and as a claim partially raised and rejected on appeal. Claims III-VII are rejected as claims made and rejected on appeal, which are not cognizable on habeas corpus. (*In re Harris* (1993) 5 Cal.4th 813, 827 [21 Cal.Rptr.2d 373, 855 P.2d 391]; *In re Waltreus* (1965) 62 Cal.2d 218, 225 [42 Cal.Rptr. 9, 397 P.2d 1001].) Claim VIII and claim IX, to the extent claim IX is directed to the guilt verdict, are rejected on the merits.

[5]Shinn was disbarred on September 16, 1992. (*In the Matter of Shinn* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 96.) He had been disciplined earlier (Bar Misc. No. 5444). In that proceeding Shinn was suspended effective September 25, 1987, but the suspension was stayed and he was placed on probation for two years with an actual suspension of three months.

In recommending disbarment for misappropriation of client funds, the State Bar Court stated that Shinn "lacks basic understanding of the most fundamental responsibilities of an attorney as embodied in the provisions of the Business and Professions Code and the Rules of Professional Conduct." (*In the Matter of Shinn, supra*, 2 Cal. State Bar Ct. Rptr. at p. 107.)

[6]Our limitation of the order to show cause to the penalty phase ineffective counsel issue reflects an implicit determination that the petition fails to state a prima facie case for relief on the remaining grounds. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 119, fn. 37 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 362-363 [233 Cal.Rptr. 368, 729 P.2d 802].)

passengers, driven by Pamela Cummings, Raynard's wife, as they drove through the Lakeview Terrace district of the San Fernando Valley. In the weeks before Verna stopped the car for a traffic violation, Cummings, allegedly with petitioner, had committed a series of robberies in Los Angeles County. Following his arrest petitioner was held in the Los Angeles County jail.

Daye Shinn met with petitioner in the county jail and appeared as retained counsel for petitioner at the preliminary hearing, replacing a deputy public defender who had been appointed by the court. Petitioner had retained Shinn prior to the preliminary hearing on the fraudulent representation by Shinn and Marcus McBroom that Shinn's fees would be paid by a group of Black businessmen. Shinn was later appointed to represent petitioner after Shinn first advised petitioner to tell the court that petitioner's parents would pay Shinn's fees and then advised petitioner to tell the court that his parents could not do so. As will be discussed in more detail below, Shinn's fraudulent representations to petitioner and the court were part of a scheme in which Shinn brought Dr. Fred Weaver, a psychiatrist, and Marcus McBroom, who acted as Weaver's assistant, into the case.

A pretrial statement admitting petitioner's complicity in the several robberies with which he was charged was admitted at trial. Shinn had advised petitioner to make the statement to an investigating officer, falsely assuring petitioner that the statement would not be admissible at trial.

During the penalty phase of the trial, Shinn called Dr. Weaver to offer mitigating evidence. Dr. Weaver testified that petitioner was a sociopath with an antisocial personality, but did well in a structured custodial situation. The only other penalty phase witnesses were petitioner's mother, wife, mother-in-law, cousin, and three acquaintances, none of whom had been interviewed by Shinn, who were called to offer evidence of petitioner's good character traits. Although other potentially mitigating penalty phase evidence was readily available, Shinn himself did no investigation of penalty phase evidence and the investigation undertaken by Shinn's investigator, who was given inadequate guidance, failed to discover that evidence. These aspects of Shinn's representation are the principal focus of our inquiry.

## II

### Ineffective Counsel Allegations[7]

Although we have concluded that the petition fails to state a prima facie case for relief on ineffective counsel grounds with respect to guilt, prejudice

---

[7]This summary includes allegations of the return and traverse, as well as those made in the petition for writ of habeas corpus. Although the petition serves a limited purpose in a habeas

not having been established as to that phase of the trial, we include in our summary those factual allegations of the petition related to the quality of counsel's representation prior to the penalty phase which had an impact on the penalty determination.

Petitioner alleges in substance that Shinn engineered his appointment in the case by lies, misrepresentations, and unethical conduct. Petitioner's retention of Shinn occurred at a time when petitioner was represented by a deputy public defender. Shinn, accompanied by an African-American man in clerical garb, approached petitioner in the county jail. Shinn stated that he was an experienced criminal lawyer and that his companion was a minister who represented a group of African-American businessmen who were interested in paying for petitioner's defense because they were sure he would not otherwise receive a fair trial. The pair urged petitioner to retain Shinn because he needed a "good lawyer," and petitioner did so.

When petitioner appeared for the preliminary hearing, Shinn told petitioner to falsely tell the court that petitioner's parents had given Shinn a $5,000 retainer. Petitioner did so and Shinn was substituted as counsel. Petitioner's mother declares that she did not provide funds to retain Shinn and he did not request a retainer. Neither Shinn nor his investigator ever interviewed petitioner's parents. His mother did not meet with Shinn until the day she testified at the penalty phase of the trial.

After the preliminary hearing Shinn told petitioner to tell the court that he was without funds to pay Shinn and that Shinn should be appointed under the authority of section 987.2.

Prior to the penalty phase, Shinn arranged for petitioner to see Dr. Weaver, a psychiatrist. Weaver's assistant, Dr. McBroom, was the minister who had accompanied Shinn to the jail when Shinn solicited employment.

Petitioner alleges that Shinn's performance at the penalty phase was deficient in numerous ways. Possibly the most damaging allegation was that, after falsely assuring petitioner the statement could not be used against him at trial, Shinn misled petitioner into making a statement to investigating officers in which petitioner admitted participating in the robberies with which he was charged. Shinn also failed to adequately investigate and discover available mitigating evidence, used an incompetent mental health

corpus proceeding (see *In re Lawler* (1979) 23 Cal.3d 190, 194 [151 Cal.Rptr. 833, 588 P.2d 1257]), petitioner's traverse incorporates by reference all of the factual allegations of the petition and his informal reply to respondent's informal response to the petition. Our summary of petitioner's allegations therefore includes those made in each of these documents.

expert, and had no coherent penalty phase strategy. Petitioner attributes Shinn's selection of Dr. Weaver as his mental health expert to a conflict of interest arising out of an allegedly improper "capping" arrangement whereby Dr. McBroom solicited clients for Shinn who then retained Dr. Weaver, for whom McBroom was an assistant.

Petitioner alleges that at the time Shinn represented him, Shinn labored under another clear, but undisclosed, conflict of interest arising out of complaints made against Shinn by a former client to the State Bar, various legislators, and the district attorney regarding Shinn's misappropriation of client funds. The State Bar investigation threatened Shinn's license and livelihood. At the time Shinn was acting on his own behalf in these investigations; he was unable to devote full time to the representation of or adequately defend petitioner.

A. *Prepenalty-phase Conduct.*

Petitioner alleges more specifically with regard to the robbery-related counts that Shinn advised him to confess to those charges in a pretrial interview with a police investigator, falsely telling petitioner that Shinn had an agreement that petitioner would confess to those counts and testify for the prosecution and his statement would not be used against him. Shinn did not have an agreement to that effect. At a hearing on the admissibility of the taped statement petitioner made during that interview, the police investigator testified in response to questioning by Shinn that there was no such agreement and that the investigator believed petitioner was truthful in his confession to the robbery-related offenses. In a deposition taken prior to the filing of the petition for writ of habeas corpus, Shinn testified that he did not remember what reason, if any, he had for questioning the investigator in that fashion.[8]

■■■■ Respondent denies that Shinn induced petitioner to confess to the robberies,[9] and asserts that they would have been proven at the penalty phase in any event. Therefore, respondent asserts, Shinn's conduct in this regard did not cause any prejudice at the penalty phase.

---

[8]Shinn was deposed on order of the superior court, which directed Shinn to assist petitioner's habeas corpus counsel. In his testimony he acknowledged that he was present at the interview at which petitioner made his statement, but could not recall whose idea it was for petitioner to admit participating in the robberies. He could not recall who initiated the interview, did not recall why he and petitioner went to the prosecutor's office, and did not recall what they were trying to accomplish.

Shinn acknowledged that he had destroyed his files on petitioner's case. He did not believe it was important to retain the files for a retrial since none of his cases had ever been reversed and if that happened he would again be able to obtain discovery.

[9]Respondent does not offer any factual basis for this denial and for general denials of most of the other factual allegations of the petition. Although a declaration by Shinn accompanies

Because this court reversed the robbery-related counts on appeal, we consider only whether Shinn's conduct in these matters was incompetent and, if so, whether consideration of those robberies and attempted robberies, coupled with the impact of Shinn's other failings, was so prejudicial with regard to the penalty verdict as to render the death penalty verdict unreliable. (*Strickland* v. *Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

B. *Murder Count—Guilt Phase.*

Petitioner alleges that Shinn inexplicably introduced into evidence exhibit C, a statement by Pamela Cummings accusing petitioner of being the person who fired the first shot at Officer Verna and who then left the car and fired the remaining shots into the officer's body. She declared that he did this while codefendant Raynard Cummings was asking "what's going on." He also introduced exhibit D, a statement by Raynard Cummings, accusing petitioner of firing all of the shots. In a deposition Shinn could not recall any tactical reason for introducing these exhibits.

Petitioner also alleges that Shinn failed to discover and call four witnesses to whom Cummings had admitted that he killed Officer Verna. One, Jack Flores, had been a jail inmate whose declaration states that he was in a cell adjacent to Raynard Cummings in June and July 1983. Cummings described the shooting to Flores, admitting that he had been the only person to shoot Verna. Flores gave a statement to two Los Angeles Police Department detectives on July 11, 1983. He states that he also gave them a letter by Cummings admitting that Cummings did all the shooting. Flores gave the

---

the return, it does not mention petitioner's statement regarding the robberies. We have had occasion before to express our disapproval of a respondent's reliance on general denials of factual allegations in a habeas corpus petition. (See *People* v. *Duvall* (1995) 9 Cal.4th 464, 475-480 [37 Cal.Rptr.2d 259, 886 P.2d 1252]; *In re Bower* (1985) 38 Cal.3d 865, 872-873 [215 Cal.Rptr. 267, 700 P.2d 1269]; *In re Lewallen* (1979) 23 Cal.3d 274, 278, fn. 2 [152 Cal.Rptr. 528, 590 P.2d 383, 100 A.L.R.3d 823]. ["We emphasize our disapproval of the practice of setting out in a return to an order to show cause mere general denials of a habeas corpus petition's allegations. Because the issuance of an order to show cause reflects the issuing court's determination that the petition states facts which, if true, entitle the petitioner to relief [citations], *the respondent should recite the facts upon which the denial of petitioner's allegations is based, and, where appropriate, should provide such documentary evidence, affidavits, or other materials as will enable the court to determine which issues are truly disputed.*" (Italics added.)].)

We recognize, of course, that the truth of some factual allegations is known only to the petitioner or to sources not available to the respondent. A denial of those allegations with an explanation that evidence to refute them is unavailable is sufficient to identify a disputed factual issue which, unless the allegation is abandoned in the petitioner's traverse, the truth of which may have to be determined through an evidentiary hearing at which the petitioner's credibility can be tested.

letter to the police. Flores was called as a prosecution witness at the separate trial of the penalty phase for Cummings. He states that he was told that the prosecution did not intend to ask him to testify about Cummings's admissions.

Petitioner also alleges that Shinn did not call jail inmate James Edward Jennings who made a statement to the police about Cummings's description of Cummings's role in the killings. Jennings had ridden with Cummings on a bus going to court. In the statement, exhibit E to the petition, Jennings says that Cummings bragged about how he shot and killed Officer Verna and about a series of robberies and auto thefts. Cummings told Jennings that Cummings was in the backseat of the car stopped by Officer Verna. Gay was in the front seat. When the officer asked for I.D., Cummings said "I've got I.D." He then pulled a gun from between his legs and shot Verna twice in the upper body, once in the neck or shoulder area and once in the upper body area. Verna then spun about, at which time Cummings shot Verna in the back.

Allegedly Michael Gaxiola, another jail inmate who was not called as a witness, had been interviewed at the Los Angeles County Hall of Justice about a conversation with Cummings in which Cummings told Gaxiola that he shot Officer Verna because he was not going to go back to jail or allow Verna to jail his wife.

Shinn also failed to call Robin Gay, who had waived her privilege against self-incrimination before the grand jury, although she had refused to testify at trial. In her grand jury testimony, she claimed that after the shootings, Raynard Cummings admitted he "downed" the officer and reenacted events in which Raynard fired the initial shots from the back seat of the car and then got out and shot Officer Verna to death.

Petitioner argues that by failing to offer this evidence at the guilt phase, Shinn eliminated any basis for a "lingering doubt" argument during the penalty phase of the trial.

C. *Penalty Phase.*

1. *Acts and omissions during trial.*

Petitioner alleges that Shinn failed to investigate and rebut prosecution evidence of prior violent criminal activity and did not object to inadmissible aggravating evidence. He claims that the evidence Shinn presented through the testimony of Dr. Weaver, who testified that petitioner had an antisocial

personality, was inaccurate, ill-informed, damaging, and actually corroborated prosecution evidence rather than offering mitigating factors for jury consideration.

Petitioner also alleges that although Weaver's testimony referred to petitioner's troubled childhood, the testimony was ineffective and uncompelling because it lacked detail, and was incomplete, cursory, conclusory, and perfunctory; that it was not part of an integrated approach to the case; and that Shinn did not prepare Weaver to testify and Weaver was not a competent penalty phase expert. Weaver did not testify regarding psychological problems suffered by petitioner.

Petitioner also complains that Shinn conceded that petitioner had committed the prior violent criminal acts and virtually conceded that death was the appropriate penalty.

Among the items of evidence to which no objection was offered was evidence that while in jail awaiting trial, petitioner had made threats against a jail guard and his family, evidence that was inadmissible as direct evidence in aggravation.[10]

### 2. *Medical/social history.*

Petitioner claims Shinn should have discovered and presented as a mitigating factor evidence that petitioner was raised in a deprived, abusive, and chaotic home environment, suffered head injuries, and had medical problems which affected his behavior, his ability to reason, and his response to stressful situations. In support of his claim that relevant mitigating evidence was available, petitioner submitted the declaration of Joan Carroll Cartwright, Ph.D., a clinical psychologist who has interviewed petitioner and reviewed case materials regarding petitioner that have now been assembled. She states that she has reviewed the trial testimony of Dr. Weaver, whose competence and diagnosis she questions because he failed to obtain any of the background data required for a competent diagnosis. She declares that no competent professional would have administered the "Gestalt" test used by Dr. Weaver's assistant in 1985 to detect brain injury. The assistant administered an intelligence test (WISC) that is appropriate only for children and could not adequately measure petitioner's intelligence.

Based on her own investigation, Dr. Cartwright concludes that petitioner is the victim of a dysfunctional and violent home in which he and his

---

[10]The evidence would have been admissible in rebuttal to petitioner's evidence that he behaved well in a structured setting.

siblings experienced "extreme physical abuse" by an alcoholic father who had limited mental capacity and substantial mental impairments. Petitioner's mother was emotionally neglectful of abuse toward petitioner and his siblings. Petitioner was beaten on the head by his father and also suffered head trauma in accidents while in institutions. He suffered headaches, blackouts, memory loss and attention/concentration problems as well as physical ailments.

Petitioner's father, Van Gay, who is Black, had an IQ of 65. He contracted syphilis and gonorrhea in 1956, and because these diseases were not cured, he deteriorated mentally and psychologically. He was an abusive alcoholic, and was diagnosed as having a "form of passive-aggressive personality of the passive dependent type with hysterical features and neurosis with depressive and conversion reactions." In 1983, petitioner's father was found to have a moderate to severe depressive disorder and was fearful of emotional closeness. He was diagnosed as having depression and paranoia.

Dr. Cartwright's declaration describes additional evidence of childhood and adolescent problems of petitioner and his siblings, none of which evidence was presented by Shinn and most of which would have been relevant, mitigating evidence.

Respondent denies the allegations related to inadequate penalty phase investigation and preparation for lack of information and belief, and argues that, assuming Shinn failed to investigate and obtain background information and records, it made no difference. Based on a declaration by Shinn, respondent also asserts that Shinn was willing to call additional witnesses at the penalty phase but petitioner did not want them to testify. The witnesses who testified were those approved by petitioner. Petitioner admits that he approved the witnesses who testified, but denies the truth of the assertion that he instructed Shinn not to call other witnesses. He alleges that Shinn failed to investigate or contact the penalty phase witnesses who did testify until the day of their testimony. In his traverse he reasserts the claim that Shinn failed to obtain available and necessary records or interview available members of petitioner's family regarding their social, medical, and psychiatric history.

### 3. *Incompetent mental health professional.*

Petitioner contends that Dr. Weaver was incompetent. He supports this claim with Dr. Cartwright's declaration.

· Respondent denies the allegation that Shinn failed to consult with competent mental health experts regarding "mental state defenses," denies that

such defenses were available, asserts that the experts whom Shinn consulted were competent, and argues that permitting Dr. Weaver to testify that petitioner was a sociopath and had an antisocial personality was not unreasonable. In a declaration accompanying the return Shinn states that he had worked with psychologist McBroom in the past through Weaver and believed that he had the proper licenses to administer psychological testing on petitioner. Shinn had used Weaver as an expert witness before and used him after petitioner's case. He did so because he did a "good job." He was not obligated in any way to use the services of either McBroom or Weaver in petitioner's case.

### 4. *Conflict of interest.*

In related allegations petitioner asserts that Shinn misrepresented facts to him and failed to disclose material facts which effectively precluded his participation in his own defense. These acts included the failure to disclose Shinn's allegedly "unlawful capping relationship" with Drs. Weaver and McBroom, failure to disclose that he intended to utilize their services as a result of that relationship, as well as failure to disclose that McBroom was unlicensed and Weaver incompetent. He alleges that Shinn was obligated to utilize the services of Weaver and, because he had to pay Weaver for those services, had an incentive to limit the time Weaver devoted to the case and thus keep Weaver's charges to a minimum.

Petitioner contends that Shinn's alleged failure to obtain the assistance of a competent mental health professional to assist in developing and presenting mitigating evidence resulted from a conflict of interest. He alleges that the minister who told him that the defense would be funded by a group of Black businessmen and that he should retain Shinn was in fact Dr. Marcus McBroom, the psychologist who assisted Dr. Weaver. He alleges that Dr. McBroom, who administered psychological tests to petitioner, is not licensed in California.

Relying on a declaration by Shinn, respondent denies that Shinn had a conflict of interest in retaining Weaver and McBroom that precluded his hiring competent mental health professionals. Respondent also denies that Shinn was accompanied by a man in clerical garb when he met petitioner, but concedes that the declarations of Shinn and McBroom differ regarding the first meeting with petitioner. Shinn declares that his first contact with petitioner was through McBroom who told him that a group of Black businessmen wanted Shinn to represent Gay. Shinn went to the jail with McBroom and petitioner agreed to representation by Shinn. McBroom told Shinn thereafter that the businessmen would not pay. Shinn met with

petitioner and told him that he was no longer willing to represent petitioner. Petitioner suggested the possibility that Shinn's fees would be paid by petitioner's family.

In interviews with respondent's investigator, McBroom acknowledged that he met petitioner in the county jail and that he and Dr. Weaver have worked with Shinn on numerous occasions. He stated that when Shinn asked Weaver's assistance, Weaver told Shinn that McBroom would be assisting. Shinn wanted McBroom to go to the county jail so that McBroom could meet petitioner and petitioner would know who McBroom was. Shinn and petitioner appeared to know one another when McBroom first met petitioner. He denied that he presented himself as a minister in order to get Shinn retained as counsel for petitioner, claiming that Shinn was already attorney of record when he met petitioner. He asserts that licensing is not required for the tests he administered. Weaver, who holds a valid California license, believes that McBroom was qualified to administer the tests under Weaver's supervision.[11]

## III

### *Constitutionally Ineffective Counsel*

■ Well-established legal criteria govern the assessment of an ineffective counsel claim.

Both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant effective assistance of counsel. (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 686, 691-692 [104 S.Ct. at pp. 2063-2064, 2066-2067]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) The right of a criminal defendant to counsel "entitles the defendant not to some bare assistance but rather to *effective* assistance." (*In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370].) "Specifically, he is

---

[11]McBroom told respondent's investigator that he holds a doctoral degree from Golden State University, which closed in 1961 or 1962; completed "a course requirement doctrine" in counseling psychology at University of California, Los Angeles (UCLA); taught graduate psychology for one semester at California State University, Northridge; has two years of premedical/prelaw study at Wilberforce Academy, a bachelor of science from Columbia, a master of arts degree from Columbia, and a religious science degree from Holmes University in Los Angeles, as well as postgraduate studies in psychodiagnostic testing.

Weaver states that he is a licensed physician and received his degree from Meharry Medical College in 1955. He completed psychiatric training at UCLA in 1959. He is licensed to administer psychological/psychiatric tests, but does not do so personally. He uses other medical personnel to administer the tests. Weaver met McBroom in 1957 and began working with him in 1963.

entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate. (*In re Cordero, supra*, 46 Cal.3d at p. 180.) This means that before counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation." (*In re Marquez* (1992) 1 Cal.4th 584, 602 [3 Cal.Rptr.2d 727, 822 P.2d 435] (*Marquez*)); see also *People* v. *Ledesma, supra*, 43 Cal.3d at p. 215.) While our scrutiny of an attorney's conduct of the defense is deferential, that deference is limited. "[I]t must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions. Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance." (*People* v. *Ledesma, supra*, 43 Cal.3d at p. 217.)

■ A habeas corpus petitioner bears the burden of proof of the facts on which an incompetent counsel challenge to the validity of the judgment under which the petitioner is restrained is predicated, by a preponderance of the evidence. (*In re Visciotti* (1996) 14 Cal.4th 325, 351 [58 Cal.Rptr.2d 801, 926 P.2d 987].) To do so on a theory that he received constitutionally inadequate representation by counsel at the penalty phase of his trial, he must establish that counsel's performance did not meet an objective standard of reasonableness under prevailing professional norms and that he suffered prejudice thereby. (*Strickland* v. *Washington, supra*, 466 U.S. at p. 694 [104 S.Ct. at p. 2068].) Prejudice is established when " 'there is a reasonable probability that, absent the errors [of counsel], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' [Citations.] As in the guilt phase, reasonable probability is defined as one that undermines confidence in the verdict." (*Marquez, supra*, 1 Cal.4th at p. 606.) Alternatively, the petitioner may establish that as a result of counsel's inadequacy, the prosecution case was not subject to meaningful adversarial testing, thereby raising a presumption that the result is unreliable. (*United States* v. *Cronic* (1984) 466 U.S. 648, 658-659 [104 S.Ct. 2039, 2046-2047, 80 L.Ed.2d 657].)

Before these criteria are applied, we address factual disputes which appear in the return and traverse where resolution is necessary to determine the merits of petitioner's claim of constitutionally ineffective representation by counsel at the penalty phase of his trial.

IV

*Reference of Disputed Factual Questions*

This court appointed the Honorable J. Stephen Czuleger, Judge of the Los Angeles Superior Court, to sit as a referee and resolve factual disputes.

Judge Czuleger was asked to take evidence and make findings of fact on several questions. Those in which the findings are relevant to our conclusions are discussed below. ■ In our review of the parties' exceptions to the findings of the referee, we apply well-settled law. "The referee's conclusions of law are subject to independent review, as is his resolution of mixed questions of law and fact. [Citations.] . . . The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence. The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying." (*Marquez, supra,* 1 Cal.4th at p. 603; see also *In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466].)

The findings of Judge Czuleger on the questions relevant to our proposed disposition, the parties' exceptions thereto, and the findings of this court follow each question.

Because the potential penalty phase prejudice from jury consideration of the robberies with which petitioner was charged is high, we first consider the referee's findings on the question related to petitioner's claim that Shinn incompetently induced him to confess to the several robberies which preceded the murder of Officer Verna.

A. *Did trial counsel induce petitioner to confess to the commission of the several robberies with which petitioner was charged and to the commission of the Valley Vacuum Cleaner robbery; was petitioner advised of the potential consequences of that confession; and did the prosecutor or the investigators give trial counsel any reason to believe that the statement given by petitioner in which he confessed would not be used against petitioner at trial?*

*Findings:* "Shinn induced Petitioner to confess to the charged and uncharged robberies. Shinn advised Petitioner that it would be in his own best interest to cooperate with the prosecution and that he might be able to work out a favorable disposition of his case as a result. Petitioner was told by Shinn that the statement could not be used against him if the prosecutors decided not to use him as a witness.

"At the time of the tape recorded interview with the deputy district attorney, Petitioner was advised of his rights against self-incrimination and told that there were no promises or agreements between the defense and prosecution in advance of the interview. Petitioner and Shinn stated that they understood the admonition.

"Neither the prosecutor nor the investigators specifically gave trial counsel any reason to believe that the statement would not be used against Petitioner at trial. Shinn, from past experiences with the District Attorney's Office nonetheless believed that he had this understanding and so advised Petitioner."

*Exceptions*: Petitioner excepts to the findings to the extent that the referee's statement that the prosecutor and his investigators did not "specifically" give Shinn reason to believe that petitioner's statements would not be used might be read as a finding that they may have done so implicitly in their statements and conduct.

Respondent does not except to these findings and argues that the evidence established that neither Shinn nor petitioner had any indication from the prosecutor or investigator that any agreement existed.

The findings of the referee are fully supported by the evidence and are adopted by the court as its own.

 Respondent argues that Shinn's incompetent performance in inducing petitioner to admit participation in the robberies was not prejudicial as defendant would have been convicted of the robberies even apart from those admissions. The evidence at trial suggests otherwise with respect to several of the robberies, however.

Three of the robbery counts were based on an April 25, 1983, robbery of the operators of Kenn Cleaners. None of the victims identified petitioner as a participant. Only Pamela Cummings testified that petitioner was present. Pamela Cummings was an accomplice as a matter of law whose testimony identifying petitioner as one of the robbers had to be corroborated. (§ 1111.)[12] Apart from petitioner's admissions, there was no direct evidence corroborating her identification of petitioner as one of the robbers. The same is true as to the two robbery counts based on the May 6, 1983, robbery of the operators of the Salads Plus salad bar. None of the three victims of the May 29, 1983, robbery of the operators of the Pizza Man delivery service identified petitioner.

Respondent argues that evidence that Cummings's accomplice was light skinned was sufficient corroboration. We are not persuaded. An inference

---

[12]Section 1111: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

might be drawn that because petitioner was light skinned and had been Cummings's partner in some of the robberies, petitioner was his accomplice in all of the robberies. ▪ Circumstantial evidence is sufficient to corroborate the testimony of an accomplice, and slight evidence may be sufficient corroboration. (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1128 [36 Cal.Rptr.2d 235, 885 P.2d 1].) ▪ While a court might well recognize this evidence was sufficient if the question arose on appeal after conviction, here we cannot say with assurance that it is probable that a jury would necessarily find the evidence sufficient. If it did not, the jury would not convict petitioner of six of the robbery-related counts had his statement not been introduced.

Even were we to assume that a jury would accept the circumstantial evidence that petitioner was Cummings's accomplice during those robberies as corroboration of Pamela's testimony, Shinn's conduct harmed petitioner. The statement Shinn misled petitioner into making, a stipulation that petitioner was a serial robber, made it unnecessary for the jury to grapple with the question of corroboration. The statement Shinn incompetently elicited from petitioner made the prosecution's case.

There were problems with two of the other counts which might have affected those verdicts also. The victim of the May 20, 1983, Designer Florist robbery was unable to identify petitioner in court. She testified that "Kenneth Gay" had robbed her, but that was after seeing petitioner, whom she did not then recognize, on television. Moreover, the victim of the repair shop robbery on May 13, 1983, was deceased at the time of trial. His identification of petitioner came in the reading of his preliminary hearing testimony. There was no in-court visual identification of petitioner by either of these witnesses.

It is possible, therefore, that but for Shinn's incompetence in inducing petitioner to confess the robberies to the officers investigating the murder, he would not have been convicted of several of the robberies. Moreover, the question of petitioner's guilt might not have been put to the jury at all, if, as did occur on one count, the trial court granted a motion for acquittal. (§ 1118.1.)

The prejudicial impact at the penalty phase of the admission of petitioner's statement confessing to the robberies cannot be understated. Shinn not only acted as a second prosecutor by creating the evidence that led to petitioner's conviction of the robberies, his conduct permitted the prosecutor to portray petitioner as an admitted serial robber who killed a police officer to avoid arrest and prosecution for the robberies. That picture of defendant,

absent any substantial mitigating evidence, would be devastating to any hope for a sentence less than death.

As our opinion affirming the judgment on appeal reflects, little mitigating evidence was offered on petitioner's behalf at the penalty trial, although evidence offered at the habeas corpus hearing suggests that much more potentially mitigating evidence was easily accessible. Some of that evidence related to petitioner's "mental status." Therefore, because Shinn engineered his appointment through his relationship with Marcus McBroom, an assistant of Dr. Weaver, the psychiatrist Shinn subsequently engaged to assist in this case, we next consider the questions related to the retention of Shinn to represent petitioner, Shinn's selection of Dr. Weaver as his mental health expert, and the impact of Shinn's conduct and instructions to Dr. Weaver on the investigation into mental health as a potentially mitigating factor.

B. *What contacts between trial counsel, Marcus McBroom, and/or other persons led to petitioner's election to retain Daye Shinn; did McBroom represent himself to petitioner as a clergyman and encourage petitioner to retain Shinn; was petitioner told that a group of businessmen would pay the fees of private counsel and, if so, by whom was he told and was that statement true; did Shinn tell petitioner to tell the court that his parents had paid a retainer to Shinn, if so, was that statement true; and did Shinn at the time he was retained intend to seek appointment later, knowing that his fee would not be paid by petitioner's parents?*

■ *Findings*: "While Petitioner was in county jail in late June, 1983, Shinn and Marcus McBroom introduced themselves to Petitioner. McBroom identified himself as a minister and told Petitioner that he represented a group of black businessmen that wished to hire a lawyer for Petitioner. McBroom was an ordained minister. Both Shinn and McBroom encouraged Petitioner to retain Shinn. Petitioner said he had no money to retain counsel and Petitioner was told not to worry that this group of black businessmen would take care of Shinn's fee.

"Shinn never quoted a fee, was paid a fee, or attempted to collect a fee from the alleged group of businessmen.

"There is no evidence to cause this Court to believe that there ever was any group of 'black businessmen' to pay Shinn's retainer. Shinn later told Petitioner to tell the court that his parents had paid a retainer to Shinn. This was not accurate. Shinn never had any reasonable belief that he would be paid by any group of businessmen or Petitioner's family. Shinn's intent from early on was to seek appointment by the Court."

*Exceptions*: There are no exceptions to the findings, which are amply supported by the testimony of petitioner. We adopt them. Shinn engineered both his initial retention and subsequent appointment by fraudulent means.

Petitioner argues that representation by an attorney whose retention and appointment is brought about by such a fraudulent and unethical scheme should be presumed to have been prejudicial, thus requiring reversal of his conviction. In concluding that the allegations of the petition failed to state a prima facie case with respect to the guilt phase, however, we impliedly rejected the argument that prejudice is presumed from such conduct. Shinn's fraudulent schemes are clearly relevant, however, in assessing his credibility, his relationship with Dr. Weaver, and his commitment to act as a zealous advocate at the penalty phase of the trial.

C. *Is there any basis for concluding that Shinn had a conflict of interest, or a reason other than demonstrated competence which led him to use Fred Weaver, M.D. and/or Marcus McBroom as his mental health experts, and, if so, what are the facts which might support such a conclusion?*

*Findings*: "Marcus McBroom brought Shinn into Petitioner's case. Shinn had worked with Dr. Weaver and McBroom in the past. McBroom contacted Dr. Weaver and asked him if he would be interested in working on the case. Dr. Weaver said he would if he was satisfied after talking to Shinn about the time commitment necessary. Dr. Weaver indicated that he was in the 'waning' years of his forensic work and did not want a long and complicated case.

"After speaking to Shinn and McBroom together, Dr. Weaver learned that an extensive commitment of time would not be necessary and he agreed to take the case. Shinn knew that by retaining Dr. Weaver, McBroom would also be utilized to perform the diagnostic testing. Dr. Weaver had never worked on a death penalty case before.

"There is no evidence of a direct conflict of interest. The evidence does show a prior relationship between the three individuals, that the three had previously worked together, and that McBroom had engineered Shinn's entry onto the case. Simply because of this prior relationship, the three worked together on Petitioner's case."

*Exceptions*: Petitioner does not except to these findings, but states that the evidence supports a conclusion that Weaver was selected solely because of the past relationship he and McBroom had with Shinn, and/or because Weaver was not interested in a complicated assignment.

Respondent does not except to these findings.

Petitioner argues on the basis of the findings and the evidence that the record demonstrates that Shinn did not want an extended mental health workup of petitioner at the penalty phase and limited the scope of the examination to be performed, and that Dr. Weaver was neither qualified nor interested in undertaking the quality of analysis necessary in this case.

Respondent contends that the evidence establishes that neither Shinn's apparent belief that the death penalty was inevitable nor the monetary limitations affected the adequacy of the examination performed by Dr. Weaver. Respondent relies on answers given by Dr. Weaver on cross-examination for an argument that Dr. Weaver himself concluded, after his independent evaluation, that the case was hopeless and since there was not too much that would make a difference, Dr. Weaver concluded that additional time was not necessary. Dr. Weaver's conclusions did not affect his work, however, and he felt he spent the appropriate amount of time necessary for the examination and review and to form his opinion, and would not have rendered an inadequate opinion in a case in which a defendant faced execution.

■ We adopt the referee's factual findings. Although he concluded that there was no evidence of a direct conflict of interest, he did not find that there was no conflict of interest. His factual findings suggest that there was. It is apparent from the record that Shinn did not select Dr. Weaver because of his demonstrated competence. Instead, the record supports a conclusion that Shinn, McBroom, and Weaver had a capping relationship pursuant to which Weaver was retained in cases in which McBroom had arranged representation by Shinn. While the conflict may not have been "direct," the only reasonable inference from the evidence is that in cases in which he had been introduced to the client by McBroom, Shinn did not consider retaining experts other than Weaver.

The finding that Shinn retained Dr. Weaver with the understanding that Weaver was not willing to commit the time or undertake the work necessary for a complicated case is consistent with this conclusion and amply supported by the record. As the evidence relevant to the next questions reflects, the record also supports a conclusion that both Shinn and Weaver considered the death penalty a foregone conclusion and for that reason Shinn did not undertake, and did not instruct Weaver to undertake, the type of penalty phase investigation and preparation expected of competent professionals in a capital case.

The evidence does not support respondent's view of the adequacy of Dr. Weaver's examination and opinion. Dr. Weaver had been used as an expert

by Shinn in several prior criminal cases in which diminished capacity issues were raised. Petitioner's trial was his only experience testifying at the penalty phase of a capital trial, although he had testified in two prior murder cases in the early 1970's. He became involved only three weeks before his testimony, when Marcus McBroom telephoned him. At that time Dr. Weaver's interest in forensic cases was "waning." Forensic work took time from other areas in which he was interested. Additional training and experience in forensic psychiatry, which Weaver did not have, was now expected of experts in this field. Weaver therefore accepted the case only after McBroom told him it was "an open-and-shut case" which would not require much time and Shinn told him the same. Dr. Weaver's own experience growing up in the South gave him a sense that when a Black man was charged with killing a policeman the case was hopeless. Shinn neither advised Dr. Weaver about the mitigating evidence he hoped to offer at the penalty trial, nor discussed how Dr. Weaver's testimony would fit into the penalty phase presentation. Dr. Weaver gave his report to Shinn, who spent only about five minutes in the hall outside the courtroom with Dr. Weaver before Dr. Weaver testified.

Dr. Weaver understood he was to see petitioner once or twice, make a short assessment, and report back to Shinn. Investigation of petitioner's drug use or discussion with his family would have been considered an unnecessary "frill" in what was an open-and-shut case. Dr. Weaver had no school, medical, hospital, correctional, employment, military, or juvenile records for petitioner or any family members when he examined petitioner. He had no sources of information other than petitioner himself, McBroom's reports, and material attached to or part of police reports. Ordinarily, he would have felt that additional material was needed, but he did not in this case. He would not have taken the case if it had required any extensive investigation. It was in this context that Dr. Weaver responded affirmatively to a suggestion made on cross-examination that "otherwise" he would not have rendered what he considered to be an inadequate opinion in a capital case.

Although Dr. Weaver did see petitioner more often than he initially believed was required and more than he would have normally done given the amount of the fee,[13] Weaver felt that he did not need to do his best. He was just to "go through the motions" and he did not do his best.

The evidence amply supports a conclusion that Weaver's selection as Shinn's mental health expert was attributable to Shinn's prior relationship

[13]Although petitioner appeared to have good recall of many details and was unusually literal and precise in his responses, he testified that he had never met Dr. Weaver, had never seen him before he testified at the evidentiary hearing, and had been interviewed at the jail only by McBroom who testified about that interview at the trial. It is otherwise undisputed that Dr. Weaver interviewed defendant and testified at the trial.

with McBroom and Weaver, and McBroom's involvement in Shinn's retention. Shinn's retention of Weaver notwithstanding the latter's reluctance to accept a complex or time-consuming case, his failure to supply Weaver with relevant and easily available background material, and his instructions to Weaver which limited the extent of the assessment Weaver was to make constitute constitutionally inadequate representation. Shinn's performance in this regard did not meet the standard to be expected of counsel engaged in the representation of a defendant in a capital case. These failures resulted in presentation of truncated, inadequate mental health evidence at the penalty phase.

Our conclusion that Shinn provided constitutionally inadequate assistance in this aspect of penalty phase preparation and presentation is limited to an assessment of Shinn's performance. If prejudicial, relief is available only on the basis of ineffective assistance of counsel, a denial of the right to counsel guaranteed by the Sixth Amendment to the United States Constitution. Since the state bore no responsibility for the selection of Dr. Weaver, or the limits placed on the extent of his investigation or his fee, petitioner may not claim entitlement to relief on the basis that he was denied a competent mental health expert. (Cf. *Ake* v. *Oklahoma* (1985) 470 U.S. 68 [105 S.Ct. 1087, 84 L.Ed.2d 53].) It is not the role of this court to assess the competence of a licensed physician acting within his area of expertise. We decide only that a reasonably competent attorney representing a criminal defendant facing the death penalty would not impose similar limitations, both financial and otherwise, on an expert, and that Shinn's selection of an expert who accepted the case only with the understanding that it was not complicated and would not take much time did not meet constitutional standards of competence.

The following questions and findings support our conclusion that Shinn performed incompetently in his investigation and presentation of potentially mitigating mental health evidence.

D. *What is the nature of the evaluation that Shinn requested Weaver to perform and how was the evaluation related to penalty phase defenses?*

*Findings*: "Shinn has no recollection of the nature of the evaluation which he asked Dr. Weaver to perform. However, Dr. Weaver testified convincingly that Shinn told him that the penalty phase portion of the trial was 'an open and shut case.' Shinn told him the facts of the case, that it involved the murder of a police officer and that Dr. Weaver was to examine Petitioner to see if he had any psychopathology, that is, that he was psychotic or had anything that might be labeled a psychiatric disorder. Shinn told Dr. Weaver that the purpose of the penalty portion of the trial was to determine whether

petitioner received a death sentence or life in prison. Shinn made clear to Dr. Weaver, however, that the decision was a foregone conclusion, that Petitioner would receive the death penalty and that Dr. Weaver need not spend a great deal of time on the case.

"Dr. Weaver was to be paid $1,000 for his work. He received $800 from Shinn."

*Exceptions*: Neither petitioner nor respondent excepts to these findings which we adopt as our own.

E. *Did the records reviewed by Weaver, or did petitioner himself, reveal to Weaver any history of head injuries, medical problems, child abuse or other facts that might affect petitioner's conduct, and, if so, of what information was Weaver aware?*

*Findings*: "The only records reviewed by Dr. Weaver were the police reports, the test results obtained by Marcus McBroom, possibly Exhibit I (a prison psychological evaluation) and some trial transcripts. He neither requested nor was given any other records.

"Either through direct interview with Petitioner or through comments passed on by McBroom, Dr. Weaver was aware of Petitioner's mixed race heritage, some family history, the beatings he received as a child, his drug usage, some educational and prison history and his criminal background. There is no evidence that Dr. Weaver was aware of any head or other physical injuries or that Petitioner was the alleged victim of sexual abuse."

*Exceptions*: Respondent excepts to the finding that Dr. Weaver "possibly" reviewed respondent's exhibit I, arguing that the evidence is clear that this is the report Dr. Weaver reviewed at the penalty phase of the trial.

The evidence supports the findings of the referee, which we adopt as our own.

The evidence does, as respondent contends, suggest that Dr. Weaver did review respondent's exhibit I, a parole outpatient clinic psychiatric evaluation of petitioner.[14] Weaver was not aware of past head injuries or sexual abuse suffered by petitioner, but did know that petitioner's racial heritage had caused difficulty, that petitioner had suffered abuse at the hands of his

---

[14]This parole outpatient clinic report, dated May 11, 1983, was prepared at the request of petitioner's parole officer after his March 13, 1983, release from a six-month parole violation term following his service of a term for arson.

father, and that petitioner had abused drugs. The parole outpatient clinic psychiatric report provided some information about childhood problems arising from petitioner's mixed-race heritage, a back injury he suffered in 1977 in a work-related fall, abuse by his father, and petitioner's use of LSD and marijuana.

That Dr. Weaver had very limited information regarding petitioner's background when he made his evaluation is clear from the record, however. The parole outpatient clinic psychiatric report recites only: "[P]etitioner describes himself as being 'half-white and half-black' and had to fight both racial groups as a child. He recalls being suspended and expelled several times from school though he did eventually graduate from high school. He recalls that in his youth, his father would punish him by physical beatings, causing injuries, though he used only his hand to accomplish this. [¶] He reports that he got along well with his mother who was friendly and attempted to keep her husband from harming the patient. He did not get along well with his brother, though he reports that he continues to remain close with his sisters. [¶] Employment history includes welding, a janitor, and a mechanic. His longest job was for 1-1/2 years as a welder, but he lost his job after the injury." The mental status evaluation stated that petitioner was alert and oriented in all spheres and that his memory was intact. His speech had a normal flow and his mood was neutral. The psychiatrist concluded that petitioner had limited insight and judgment and opined that the prognosis for return to criminal activity was high and that petitioner was likely to react to small frustration in a violent and vengeful manner. No psychiatric diagnosis was made.

Dr. Weaver testified that he did not meet with any family members; had no school, prison, jail, juvenile system, employment, or military records regarding petitioner or any members of his family; and had no medical or hospital records regarding petitioner. When he did his evaluation he made no effort to obtain any of these records. He had only the parole outpatient clinic report, McBroom's test results, some police reports, and the information supplied by petitioner during his interviews with Weaver and McBroom.

F. *Did Weaver's penalty phase testimony include all potentially mitigating information regarding petitioner of which Weaver was aware from his review of records related to petitioner and his interviews and assessment of petitioner? If not, of what additional information was he aware and why was it not related to the jury?*

*Findings*: "The only 'potentially mitigating information' which Dr. Weaver was aware of but that was not relayed to the jury concerned

Petitioner's drug usage, his stress and depression at the time of evaluation, and alleged concentration or attention deficits.

"Dr. Weaver did not utilize the drug usage information because he felt that it did not [a]ffect the diagnosis of Petitioner which he described to the jury. Dr. Weaver stated that Petitioner minimized his drug use, in fact, Petitioner did not even describe that problem to him. Dr. Weaver only knew about it from what McBroom told him. In any case, he did not feel it was relevant to the evaluation which he performed.

"As to the observation of depression by Dr. Weaver, there is no evidence as to why he chose not to mention it. However, the jury was aware from the guilt portion of the trial that Petitioner had attempted suicide following his arrest. Furthermore, they obviously knew that he had just been convicted of murder.

"Concerning Petitioner's alleged attention deficit, Dr. Weaver stated that he came to this conclusion from his interviews with Petitioner. However, nowhere else, including from McBroom's testing, was that information confirmed. Moreover, it was neither explained by Dr. Weaver nor discussed further as to its relevance."

*Exceptions*: Petitioner excepts to the referee's failure to make findings regarding the potentially mitigating evidence of which Dr. Weaver should have been aware and to the failure to find that Weaver did not testify about drug use and other mitigating factors of which he was aware because he was instructed by Shinn not to undertake the work necessary to investigate such "frills."

Respondent excepts to the finding that Dr. Weaver had stated petitioner minimized his drug use and did not describe that problem, arguing that Dr. Weaver did not make that statement. Respondent concedes that the evidence supports an inference that petitioner minimized his drug use, but argues that there is no evidence that Dr. Weaver was aware of petitioner's doing so.

At the outset we note that while Dr. Gretchen White offered extensive evidence regarding petitioner's background at the habeas corpus evidentiary hearing, the many problems in petitioner's home, the impact they had on him, and drug and alcohol abuse that continued from the time petitioner was in his teens, she did not offer an opinion that he suffered from a mental disorder. She testified that she did not diagnose him and did not see the diagnostic tests that she would need to rely on. Dr. White could not rely on Dr. Weaver's testimony for an opinion because it appeared that the only test

both he and McBroom agreed was given to petitioner was the Bender Gestalt test, which would not assist in diagnosing anything about a person's personality. The Halstead test which McBroom apparently gave is, in her opinion, "diagnostically extremely weak."

Dr. White also testified that when Dr. Weaver examined petitioner and offered his diagnosis, Dr. Weaver was not aware of the Gay family genetic vulnerability to alcoholism and schizophrenia; that three siblings were schizophrenic; petitioner's attention deficit; the extent of the physical and psychological abuse suffered by petitioner; and did not know about the depressive, passive side of petitioner's personality.

David Foster, M.D., a psychiatrist and neurologist with extensive training and experience in forensic psychiatry which included examinations of 12 death row inmates, did offer a mental health evaluation. He testified on direct by declaration and was cross-examined by deposition. He had undertaken a 10-hour psychiatric evaluation of petitioner, including a mental status examination, a structured psychiatric diagnostic interview, and a lengthy open-ended interview designed to assist in eliciting contradictions and evidence of malingering and falsification. He had also reviewed extensive documents related to petitioner's childhood and adolescence, the trial and habeas corpus evidentiary hearing testimony of Dr. Weaver, petitioner's evidentiary hearing testimony, the testimony of the other witnesses at that hearing, and the social history testimony of Dr. White, the 1992 test results of neuropsychologist Dale Watson. Dr. Foster had been provided with the mitigating sentencing factors available at the 1985 penalty trial.

Dr. Foster's testimony is summarized below at some length because Shinn's failure to investigate and present evidence of mental impairment and his decision to utilize Dr. Weaver as his expert notwithstanding Weaver's unwillingness to expend significant time on the case are among Shinn's penalty phase omissions. The failure to present this kind of mental disorder/deficit evidence to the jury is a factor supporting our conclusion that Shinn's incompetence was prejudicial to petitioner at the penalty phase.

Dr. Foster had been asked if petitioner manifested psychiatric symptomatology or other evidence of mental disorders or impairments that prevented petitioner from functioning normally and if those disorders or impairments were present at the time of petitioner's crimes and trial.[15]

He concluded that at the time of the offenses and the trial petitioner suffered "from dissociation, residual symptoms of PTSD (posttraumatic

[15]Dr. Foster had also been asked for his opinion on whether Dr. Weaver made an accurate and reliable assessment of petitioner in accordance with prevailing professional standards. He concluded "[t]hat the assessment by Fred Weaver, M.D. of Kenneth Earl Gay's mental state

stress disorder), impairments due to organic brain dysfunction including, but not limited to, an attention-concentration deficit and learning difficulties, a mood disorder, and by history, psychoactive substance abuse disorder. He suffered from these impairments, the symptoms of which were heightened and converged with devastating impact on his behavior and functioning, at the time of the crime for which he was convicted. Conditions of his confinement and his impaired functioning during trial likely interfered with his competence to stand trial. The mental health evaluation provided at the trial level was grossly inadequate, because it failed to take into account Mr. Gay's history and the importance of clinical symptoms, fail[ed] to incorporate appropriate testing, and failed to consider the importance of his impairments to issues relevant to the penalty determination."

Dr. Foster stated in his testimony that petitioner presented clinical signs consistent with learning disorders and showed signs and symptoms of brain dysfunction, trauma, dissociation, and mood disturbance. The symptoms had been present over time and continued to affect petitioner's behavior and functioning. Petitioner's unusual use of language suggested a language disorder that is possibly related to a learning disability. He also manifested the documented attentional and concentration deficit. Dr. Foster found extensive evidence that petitioner has long suffered from a dissociative disorder, an impression corroborated by information in his history. The dissociative experiences occurred not only when petitioner was beaten by his father, but when he witnessed similar frightening, traumatic events. The episodes are preceded by physical sensations including dizziness or lightheadedness, anxiety and weakness, tightness of the chest, shortness of breath, racing heart, nausea, and weakness of his limbs. The sensations are consistent with dissociation and anxiety. Some are also consistent with "aura," a phenomenon that frequently precedes episodes of unstable electrical activity in the

at the time of the penalty phase was not accurate or reliable and was not made in accordance with prevailing professional standards." His reasons included the absence of a coherent referral question or even information about the nature and purpose of a capital sentencing proceeding; absence of detailed information from sources other than petitioner about his symptoms and experiences; failure to accurately identify and integrate evidence and symptoms consistent with recognized mental disorders; and failure to conduct or order appropriate testing.

This conclusion is consistent with Dr. Weaver's own testimony regarding the extent of his investigation and examination. It is also supported by Dr. Foster's detailed explanation of each of the reasons given for his conclusion.

Dr. Foster disagreed with Dr. Weaver's diagnosis of antisocial personality disorder, explaining that the exclusion criteria specified in the Diagnostic and Statistical Manual of Mental Disorders (3d ed.), DSM-III, would preclude that diagnosis. He observed also that the fourth edition of the manual, DSM-IV, refines the criteria and now precludes that diagnosis if any other significant diagnosis that could account for the person's symptoms is present. As described in the second edition of the manual, DSM-II, antisocial personality was a "garbage pail diagnosis" which attempted to describe behavior, but did not explain it.

brain, such as seizures. Petitioner stated that he experienced the same sense of detachment and unreality during the murder as he felt during beatings by his father. He was almost in a dream state and did not want to be there.

Dr. Foster also found corroboration that petitioner suffers from debilitating anxiety, grandiosity symptomatic of a mood disorder, hypomanic symptoms and entrenched depression. He also concluded that during the period before petitioner's arrest, petitioner was affected by the use of drugs.

In specific answer to the first question posed by petitioner's counsel, Dr. Foster found: "A. That Kenneth Earl Gay does show psychiatric symptomatology, corroborated by other evidence of mental disorders and impairments which prevent him from functioning normally, and these disorders and impairments were present at the time of the crimes for which he was convicted and during his trial."

As a result of "extraordinary abuse" petitioner suffered during his development and experiences throughout his later life, he manifested symptoms associated with and diagnostic of posttraumatic stress disorder as identified in the DSM-III, which was in use at the time of petitioner's offense and trial.

Petitioner also suffered incapacitating effects of mood symptoms, also known as a major affective disorder, at various times. The disorder is characterized by periods of clinical depression, manic activity, or both, which significantly interfere with occupational or social functions, and are associated with lability of mood, delusions, anxiety, irritability, excessive concern with physical health, increased emotionality, and substance abuse. The disorder has a genetic component and was found in petitioner's father and at least one sister.

Dr. Foster concluded that petitioner's multiple disabilities might be caused by a previously undiagnosed disturbance in the functioning of his brain. Both family history and head injuries suffered by petitioner suggested this disorder. The location of the head injuries, in the "association areas," indicated damage that results in difficulty integrating experiences. Petitioner functioned very poorly under overwhelming stress and his judgment, decisionmaking ability, and cognitive abilities appeared to be seriously impaired. He had a documented attention-concentration deficit, which indicated damage in the frontal lobes of his brain. Even under optimal circumstances he would have significant difficulty with ability to monitor, inhibit, or control his behavior. Indications of temporal lobe and parietal lobe damage were found in petitioner's difficulty with language and mathematics, and symptoms of temporal lobe epilepsy, including hypergraphia, hyperreligiosity,

viscosity, and altered emotional responses, all of which were observed in petitioner by Dr. Foster.

Dr. Foster also concluded that petitioner suffered from a seizure disorder originating in the temporal and limbic areas of his brain and from the effects of psychoactive substance abuse, a problem reflected in a family history remarkable for extensive drug abuse in multiple generations and various branches of the family. The use of alcohol and marijuana during the developmental period can permanently alter the development of a child's brain, causing both neurological and psychological damage. Petitioner's use of drugs as a form of self-medication combined with his neuralgic defects and residual symptoms of posttraumatic stress disorder to cause unusually disordered behavior and functioning.

Dr. Foster opined that "[r]esearch available at the time of trial could have provided powerful evidence that, at the time of the murder, Kenneth Earl Gay experienced severe abnormalities in neurotransmitter systems inside his brain caused by drug and alcohol ingestion, withdrawal from cocaine, and the triggers of trauma he had experienced and was expecting. This imbalance in the brain chemicals that stimulate different parts of the brain were highly likely to leave him in a dream-like trance, unable consciously to control his behavior. The best evidence indicates that given Mr. Gay's baseline physiology, depressed state, and use of marijuana (and perhaps alcohol and heroin), he would have chemical imbalance present, particularly in the levels of serotonin and glutamic acid in his brain." The evidence of mental health impairments would have been relevant as section 190.3, factors (d), (g), (h), (j), and (k) mitigating evidence.[16]

In support of his opinion on section 190.3, factors (g) and (j), Dr. Foster noted that petitioner's mental impairments would make him particularly susceptible to the highly aggressive, threatening, and controlling influence of Raynard Cummings. His account of the crime was entirely consistent with response to mechanisms that include increased susceptibility to follow suggestions or commands of others. His "brain was primed to respond with

---

[16]See section 190.3: factor (d)—"Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"; factor (g)— "Whether or not the defendant acted under extreme duress or under the substantial domination of another person"; factor (j)—"Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor"; factor (h)—"Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication"; factor (k)—"Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death.

automatic aggressive, 'go limp' or escape responses that were outside his conscious control. . . . [It was] highly likely that in a situation of grave and sudden danger, in the company of a person known for aggression and violence, he would submit, without consciously choosing, to the command of the aggressor. . . . [His] other impairments . . . likely overwhelmed his tenuous ability to engage in rational decision-making, even after the immediate stress of the moment had passed. In my opinion, which I hold to a reasonable medical certainty, these conditions all affected and controlled Mr. Gay's behavior and functioning at the time of the crime and thereafter, and evidence supporting this conclusion was available at the time of trial."

Finally, Dr. Foster testified that the impact of the state's aggravating evidence could have been lessened had that evidence been explained from a mental health standpoint. In particular, evidence of the circumstances leading up to petitioner's battering a 15-year-old girlfriend and pushing her into some bushes during an argument would have included the impact on petitioner of the rough neighborhood in which he was raised, his ethnicity, his dysfunctional family, drug use and its effects, and the fact that the altercation was entirely out of character. Most importantly, evidence could have been offered as to the devastating impact of the rejection of petitioner and the racial attack on him by the girl's mother when she learned of petitioner's mixed-race heritage. Evidence could have been offered that petitioner did not intend to harm the girl and that she continued to see him during and after the legal proceedings related to the arson charge.

Petitioner's behavior when he threw an incendiary device at the home of parents of another girlfriend with whom he had been living and wanted to marry could also have been explained. The incident was precipitated by the girl's mother's using a racial epithet toward petitioner when told of his biracial heritage, throwing him out of the home, and forcing her daughter to return to the family home. Evidence about petitioner's confused racial identity, his father's alcoholism and abusiveness, the rough neighborhood, the drug sales by, and sexual orientation of, a neighbor, and petitioner's changed behavior while using drugs could also have been offered. Those matters and the numerous psychiatric symptoms from which petitioner suffered in the six months before the incident would have aided the jury in understanding petitioner's behavior.

On cross-examination the People elicited an acknowledgment that Dr. Foster had diagnosed posttraumatic stress disorder in several death row inmates whom he had examined and dissociative episodes consistent with posttraumatic stress disorder in another. He did not find it surprising that the disorder existed in many persons on death row given the documented social

histories of abuse. He also testified, however, that he had examined a death row inmate in whom he found no posttraumatic stress disorder. He had examined defendants for or been a consultant for the prosecution in several cases, and in five of the approximately twenty-five cases in which he had done so for the defense he had advised defense counsel that he made no findings that would be of value.

The type of mental health evaluation performed by Dr. Foster was not uncommon in capital case defense at the time of this trial. (See *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 200-201; *People* v. *Brown* (1985) 40 Cal.3d 512, 537 [230 Cal.Rptr. 834, 726 P.2d 516].) A minimal inquiry and review of documents readily available to Shinn should have alerted him that such an evaluation might produce potentially mitigating evidence. He not only failed to investigate this possibility, but also engaged an expert who was not willing to undertake an extensive analysis and placed unreasonable limits on the scope of his expert's investigation and examination that precluded discovery of this evidence. Shinn's conduct in this regard clearly falls below the level of performance expected of even minimally competent attorneys representing a defendant in a capital case. He failed to undertake any inquiry into the possible existence of mitigating mental health evidence until petitioner had been found guilty of the murder. When he did retain Dr. Weaver he conveyed to Dr. Weaver his opinion that the death penalty was a foregone conclusion, failed to supply Dr. Weaver with any background information or documentation, and agreed that Dr. Weaver need not devote much time to his examination. He asked Dr. Weaver only to determine if petitioner suffered from any mental illness at the time of the crime.

In addition to his failure to discover and develop available potentially mitigating mental health evidence, Shinn also failed to investigate, discover, and present evidence regarding petitioner's early childhood and family relationships which was both relevant to the mental health diagnosis and potentially mitigating in and of itself. These omissions also manifest incompetence.

██ "[A] defendant can reasonably expect that in the course of representation his counsel will undertake only those actions that a reasonably competent attorney would undertake. But he can also reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.] If counsel fails to make such a decision, his action—no matter how unobjectionable in the abstract—is professionally deficient." (*People* v. *Ledesma, supra,* 43 Cal.3d at p. 215.) ██ Shinn's decision to rely only on his client for sources of mitigating evidence and

conclusion that the case did not warrant a reasonable investigation into petitioner's background and mental health was not an informed decision.

Shinn's failure to investigate petitioner's social history and other potentially mitigating evidence and make an informed decision regarding this aspect of his penalty phase strategy and tactics is addressed next.

G. *Did trial counsel Daye Shinn undertake any investigation of petitioner's family and social history; medical and psychiatric or psychological history; or any other potentially mitigating background factors, and, if so, what information did he obtain which did or should have alerted him to the existence of potentially mitigating penalty phase evidence?*

*Findings*: "Attorney Shinn personally conducted no investigation of Petitioner's background. He did not subpoena or otherwise obtain any school, medical, psychiatric or work records.[17] His investigator did, however, obtain some prison records from Petitioner's mother, try to verify employment history and speak to Petitioner directly regarding witnesses which might be of assistance.

"The prison records obtained by Shinn (Respondent's Exhibit I) would have alerted him to 'potentially mitigating penalty phase evidence' in that the records, while illustrating Petitioner's violent nature, indicate some psychiatric treatment at age 16 and later while in prison from 1978 to 1981. They also describe his social history, his mixed race ancestry, his drug usage, and his poor relationship with his father which included beatings.

"Shinn did engage the services of Dr. Fred Weaver, a psychiatrist. Shinn asked Petitioner to cooperate in the evaluation of him by Dr. Weaver. Shinn wanted Dr. Weaver to investigate Petitioner's 'mental stability' or other 'mental defects' that he might be able to use, to present to the jury and possibly to save Petitioner's life. Dr. Weaver only had access to the police reports, the transcripts of the trial and the prison psychiatrist evaluation

---

[17]The referee also reported: "Shinn no longer has any of his files. They were destroyed. Investigator Douglas Payne, however, brought his notebook to court. Shinn reported that Payne kept most of his file, that is, he returned to Payne those things which Payne provided to him."

Our review of Shinn's testimony confirms that as to matters of which he had any recollection, his answers were evasive, inconsistent, and often nonresponsive. He testified that he had destroyed his files shortly after the trial, "but most of those files my investigator, Mr. Doug Payne, has." When asked again if he had destroyed "certain files," he responded "I got rid of them, yes." He then testified that Payne had most of the materials all of the time during the trial. He said it did not occur to him that the files might have been useful in subsequent proceedings such as a retrial.

described above. Dr. Weaver sent psychologist Marcus McBroom to give a number of psychological tests to Petitioner. McBroom and Dr. Weaver discussed the results of the tests and Dr. Weaver did his own examination of Petitioner. Dr. Weaver appears to have met with Petitioner two or three times. Dr. Weaver spoke to no one other than Petitioner, McBroom and Shinn in forming his opinion.

"As a result of that examination, Shinn was aware of Dr. Weaver's diagnosis of Petitioner having a 'sociopathic personality' and 'anti-social personality disorder.' A report of the examination was prepared and given to Shinn, but the report no longer exists. This evaluation and report was based upon Dr. Weaver's interviews with Petitioner and the psychological testing performed by McBroom.

"Also as a result of this evaluation and Shinn's own contact with Petitioner, Shinn was aware that Petitioner had emotional difficulties based upon his racial identity, his early childhood upbringing, physical and mental abuse within his family and drug usage."

*Exceptions*: Petitioner excepts to the findings made by the referee that Shinn's investigator attempted to verify petitioner's employment history on the basis that the investigator did not obtain Social Security records, which would have verified that history. He also complains that McBroom is referred to as a "psychologist," although not licensed as such in California, and complains that the referee failed to make a finding that McBroom administered inappropriate tests that were designed for children rather than adults, the tests were insufficient to produce a correct diagnosis, and the tests produced inaccurate results.

Petitioner also objects that the referee's report implies that Shinn directed his investigator to obtain the names of penalty phase witnesses prior to the return of the guilt phase verdicts, although the credible evidence establishes that no penalty phase work was begun until after those verdicts were returned.

Respondent excepts to the implication that Dr. Weaver's access to background information regarding petitioner was somehow limited or impeded, noting that Dr. Weaver did not request any additional records.

 The referee's findings with respect to the limited investigation Shinn undertook in preparation for the penalty phase are amply supported by the record. We adopt the findings as our own.

Shinn was the first witness at the evidentiary hearing. As noted earlier, he was able to recall little about the trial of petitioner. It is clear, however, that

beyond retaining and talking briefly to Dr. Weaver, Shinn did none of the investigation for the penalty phase and gave his investigator no specific instructions regarding the evidence to be sought.

Douglas Payne, a former Los Angeles Police Department officer and investigator, and a licensed private investigator since 1978, was appointed by the superior court to assist Shinn in July 1984. Payne had worked on two prior capital cases and several murder cases as a private investigator. He testified that his first responsibility was to review all of the information provided in discovery in order to advise Shinn if it appeared that anything had been omitted by the police department or district attorney's office. He was also to formulate a witness list, locate and interview witnesses if possible, and to meet and confer with petitioner. He told petitioner that he was a former police officer, showed petitioner his credentials, and asked if petitioner had any problem with that. Petitioner told him "no" as Payne's experience would give Payne insights into the police investigation.

Payne met with petitioner's mother who provided some documents. He spoke to every witness that he could find based on the information petitioner and other family members provided. Some witnesses on his list had moved out of the state and some were unavailable because he had no information on how to get in touch with them.

Payne's notes reflect that he had a telephone conference with Shinn and then met with petitioner at the jail on June 6, 1985. They also reflect a conference and case work on June 24 and June 27.

Payne understood from Shinn that Shinn's strategy for the penalty phase was to produce family members; people who could testify about petitioner's background and upbringing; doctors who had treated, observed, or evaluated petitioner during prior incarcerations; and anyone who could offer mitigating information. Shinn placed no limitations on Payne as to investigative areas. He was limited only by the funds authorized by the court, which granted supplemental funds as needed. Petitioner told Payne that he wanted to continue to deny his guilt at the penalty phase, but petitioner was very cooperative about developing mitigating evidence and did give Payne the names of some potential witnesses.

Petitioner did wish to present personal history evidence including his relationship with "Wendy," and the reason for the firebombing incident that involved another woman, which the People offered as aggravating evidence.

Payne did not obtain any school, military, Social Security, or employment records, but did obtain prison records through subpoenas or subpoenas duces

tecum to witnesses who brought the records when they testified. Some records were provided by petitioner's mother.

Payne testified that Shinn had spoken to penalty phase witnesses before their appearance. Payne introduced some to Shinn outside the courtroom and Shinn talked to prospective witnesses in the hallway, at his office, and at places where Payne could put them in touch. If Shinn was already aware, from conversations with petitioner, of the information the witnesses would offer, Shinn gave Payne the names and asked Payne to bring them to court.

Shinn testified that he looked to petitioner to identify family members and friends who might be defense witnesses.[18] The investigator located and interviewed the potential witnesses. Shinn read the investigator's reports and returned the reports to the investigator. He later "talked to" the witnesses before he put them on the stand. He had no recollection of interviewing any of the potential defense or prosecution witnesses other than those who were put on the stand.

Shinn's own file on petitioner's case consisted only of some "little bits of notes" he had taken during the trial on scraps of yellow paper, amounting to five or ten pieces of paper, and copies of some of the documents filed in the case.

The referee's findings regarding potentially mitigating evidence that would have been found had a more thorough investigation been undertaken are also amply supported. Readily available background and family history evidence of the kind that was routinely offered at the penalty phase of capital cases at the time of this trial (see, e.g., People v. Deere (1985) 41 Cal.3d 353, 366 [222 Cal.Rptr. 13, 710 P.2d 925]; People v. Davenport (1985) 41 Cal.3d 247, 276 [221 Cal.Rptr. 794, 710 P.2d 861]) and was offered at the habeas corpus hearing, might have been considered mitigating by the jury. That evidence showed that as a young teenager, petitioner was rejected by a group of young Black men with whom he sought to associate in a neighborhood park. They thought he was too young to "hang out" with them, but also thought he looked White, effeminate, and weak. They chased him off, throwing rocks and bottles at him, but even after he was eventually accepted he was the subject of taunts. He was called "white boy," "Gay boy," "peckerwood," "half breed," and "honky" by people in the neighborhood in which he lived and was often teased about possibly being homosexual.

---

[18]Petitioner testified that during the month between the guilt and penalty phase, he discussed with Shinn his use of alcohol and drugs, the physical abuse from his father and sexual abuse by a neighbor suffered as a child, his problems with his racial identity, and therapy he had received in prison.

Petitioner often got into fights when people teased him or grabbed him, but would run when hit hard. Then he was called a "sissy" or "coward." On occasion neighbors goaded their sons into fights with petitioner, who always got beaten.[19]

The evidence of an "extremely abusive family life" included that described under question H, *post*.

H. *If trial counsel did not investigate the above factors or some of them, or did not do so fully, what potentially mitigating evidence would a reasonably complete investigation have uncovered?*

*Findings*: "While Shinn did conduct some investigation and was aware of the matters described, *supra*, additional potentially mitigating evidence would have been available to him had he conducted more thorough investigations.[20] The evidence obtained and presented at the hearing includes:

"a. School Documents. School documents indicate Petitioner's learning disorders, depression and anxiety in the 1970's. There is possibility of low IQ as to certain subjects, hyperactivity and the possibility of a learning handicap sufficient to qualify him for special education classes.

"b. Prison Records. Prison records point out depression, anxiety and mood swings. Petitioner had a history of pyromania. He had internal conflicts over race identity and possibility of 'black outs.' Psychological testing scores contained within the records might have been viewed as inconsistent with Dr. Weaver's findings of antisocial personality disorder. Petitioner's prison records indicate that he responded well to prison-based therapy and might have been useful in seeking life in prison without the possibility of parole from the jury.

"c. Family Records. Documentation and witness accounts reveal an extremely abusive family life. Petitioner was physically beaten by his father,

---

[19]Evidence was also offered that during the same period, when he was 15 years old, petitioner and the group with whom he associated smoked PCP and marijuana, took other drugs, and drank cheap wines, all heavily, in an area where they hung out. Petitioner's cousin, Richard Kelley, testified that during summers when he stayed in the Gay home or petitioner stayed with Kelley and his family, they smoked marijuana daily and drank beer and wine. It is not clear, however, that a penalty phase jury considers evidence of youthful (or adult) drug and alcohol use to be mitigating.

[20]Although the referee's finding states what potentially mitigating evidence a "more thorough" investigation would have uncovered, we are satisfied that it is intended to be responsive to the court's question, which asked what a reasonably complete investigation would have disclosed. We recognize that it cannot be said with certainty that all of the evidence offered at the habeas corpus evidentiary hearing would have been discovered in the course of a reasonably complete investigation. Nonetheless, all of the evidence offered at the habeas corpus evidentiary hearing appears to have been readily available at the time of the trial.

Van Gay. His father was also abusive to other family members. Van Gay was cashiered from the military for improprieties of a sexual nature, had difficulty holding a job and used drugs and alcohol regularly. Other family members also had emotional problems; some of this might be attributable to the unstable home life established by Van Gay. These factors might have been utilized by a different psychiatrist to paint a more favorable picture of Petitioner and his psychological makeup. Petitioner at the evidentiary hearing presented evidence from other psychiatric experts that Petitioner at the time of trial suffered from Post-Traumatic Stress Disorder because of his upbringing.

"d. Additional Witnesses. Witnesses beyond those called at the trial were available to Shinn. He could have presented potentially mitigating evidence substantiating the family history described above. This could have included the details of Van Gay's abuse of Petitioner's mother and his encouragement of his children to use drugs. Witnesses were available to describe Petitioner's extensive drug use as a youth and in later years; that he was the subject of taunting and beatings because of his name, ancestry, and skin tone; that Petitioner was the victim of beatings by others besides his father; and that he ran away from home.

"Additionally one witness, Don Anderson, might have testified in the penalty phase portion of Petitioner's trial that witness Marsha Holt stated to him that she had not, in fact, seen the murder as she had earlier testified to in the guilt portion of the trial. This might have been offered under the theory of 'lingering doubt' in the penalty phase. This was a concept to which Shinn testified at the evidentiary hearing that he did not understand. At the time of trial, he told Petitioner that the evidence was not admissible. It appears to this Court to have been admissible."

*Exceptions*: Respondent excepts to the finding that psychological testing scores in the record might be seen as inconsistent with Dr. Weaver's findings of antisocial personality disorder. Respondent also argues that the referee erred in finding that Anderson's testimony regarding Marsha Holt's guilt phase testimony was admissible.

We also adopt the findings of the referee as to this evidence, but do not agree that the testimony of Don Anderson would have been admissible. Petitioner argues that Anderson's testimony would have been admissible to support an attempt to elicit mercy from any juror who held a lingering doubt as to his guilt of the murder. We disagree. Although the evidence was not, as Shinn believed, inadmissible hearsay, it was not relevant mitigating evidence.

At the penalty phase a defendant must be permitted to offer any relevant potentially mitigating evidence, i.e., evidence relevant to the circumstances of the offense or the defendant's character and record. (§ 190.3; *Penry* v. *Lynaugh* (1989) 492 U.S. 302, 317 [109 S.Ct. 2934, 2946, 106 L.Ed.2d 256]; *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 394, 398-399 [107 S.Ct. 1821, 1824-1825, 95 L.Ed.2d 347]; *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4-8 [106 S.Ct. 1669, 1670-1673, 90 L.Ed.2d 1]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 112-116 [102 S.Ct. 869, 875-878, 71 L.Ed.2d 1]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 605 [98 S.Ct. 2954, 2965, 57 L.Ed.2d 973] (plur. opn. of Burger, C. J.); *People* v. *Mickey* (1991) 54 Cal.3d 612, 692-693 [286 Cal.Rptr. 801, 818 P.2d 84].) Evidence intended to create a reasonable doubt as to the defendant's guilt is not relevant to the circumstances of the offense or the defendant's character and record.

Thus, while a defendant may argue that a juror who has a lingering doubt should not vote for imposition of the death penalty, the defendant may not retry the guilt phase of the trial in an effort to create such a doubt. "[A]t the penalty phase, jurors may consider any lingering doubts concerning the defendant's guilt. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 706 [276 Cal.Rptr. 788, 802 P.2d 278].) But this does not mean that the defendant may introduce evidence, not otherwise admissible at the penalty phase, for the purpose of creating a doubt as to the defendant's guilt." (*People* v. *Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

The evidence petitioner sought to introduce through the testimony of Don Anderson does not come within the category of mitigating evidence, which must or may be admitted under section 190.3 or the Eighth and Fourteenth Amendments to the United States Constitution. Evidence that is not relevant to the defendant's character, prior record, or the circumstances of the case need not be admitted (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 604, fn. 12 [98 S.Ct. at p. 2965]) and in California is not admissible. (*People* v. *Zapien, supra,* 4 Cal.4th at p. 989.)

▮▮▮ For that reason this aspect of Shinn's representation did not cause prejudice. However, the record demonstrates that Shinn also failed to undertake even a minimally competent inquiry into petitioner's background, and an inexplicable decision to rely principally on the defendant himself to identify witnesses who might offer mitigating evidence. Shinn's failure in this regard cannot be excused, as the People suggest, on the ground that he was preoccupied with preparation for the guilt phase. He might have, but did not, seek appointment of second counsel to assist in preparing for the penalty phase, and all counsel representing capital defendants must prepare for all phases of the trial. Moreover, Shinn could and should have given specific

directions to and monitored his investigator, initiated the penalty phase investigation well before the return of the guilt phase verdicts, and interviewed and prepared the witnesses he elected to present. His failure to do so appears to be directly attributable to his uninformed belief that if petitioner were to be found guilty, the death penalty was inevitable.

Petitioner testified that he had no discussion with Shinn regarding a penalty trial before the guilt phase verdicts were returned. After the verdict Shinn explained the purpose of the penalty trial to him and asked petitioner about any witnesses petitioner could find or call who had something positive to say about petitioner. Shinn told petitioner that it would be necessary to have witnesses such as schoolteachers, doctors, family members and friends who had something positive to say. Other than asking petitioner for names of witnesses and asking him to meet with a psychologist, Shinn did not ask petitioner to assist in preparing for the penalty phase. Instead, Shinn told petitioner that once the jury returned a guilty verdict, it was a foregone conclusion that the death penalty would be imposed.

Petitioner gave Shinn the names of witnesses petitioner thought could be called with the addresses or telephone numbers of some. Shinn told petitioner that he had given the names to Payne, his investigator, who would try to locate them. Petitioner recalled only one meeting with Payne, a meeting at the jail after the guilt phase verdicts had been returned. When petitioner asked Payne if Payne had been able to contact the persons petitioner had named, Payne said that he had not been able to locate any of them. With one exception, the witnesses who did testify at the guilt phase were located and brought to court by petitioner's mother. The other was petitioner's then mother-in-law whom petitioner asked to come.

Petitioner testified about the reasons for naming his potential witnesses and states that Shinn gave different reasons for failing to call any of the witnesses Shinn had subpoenaed at defendant's request. Petitioner considered Willie Campbell a relative because of some family connections. He could testify about family relationships and knew more about petitioner's extended family than petitioner himself, but Shinn said he would not be a good witness because he was a prisoner. Paula Rice, whom petitioner had met while being transported to court, had overheard Raynard Cummings bragging on several occasions about killing Officer Verna. He believed her testimony would counter the "inconsistent" testimony of other jailhouse informants who said that Cummings had implicated petitioner in his confession. Petitioner wanted Rice to testify at the guilt phase but Shinn told him

her testimony would not be admissible. Shinn told him the same when he asked to have her testify at the penalty phase.[21]

Petitioner testified that he did not recall anyone he did not want Shinn to call as a witness, and did not give Shinn any instruction that a particular item should not be offered at the penalty phase.

Prior to the penalty phase, petitioner did give Shinn information regarding his use of drugs and alcohol and discussed his racial identity concerns. He also told Shinn about the abuse he had suffered from his father, the sexual abuse by his neighbor and being placed in group therapy at the California Medical Facility at Vacaville.

Dr. Gretchen White, licensed as a clinical psychologist and as a marriage and family counselor, testified, offering evidence regarding the effect of family and childhood and social influences on petitioner's development, personality, and psychosocial history. That testimony was offered as evidence that might have been, but was not, put forth at trial as mitigating evidence. Based on her approximately 120 hours of reviewing documents about petitioner's background, declarations from family members and friends about his background, and interviews with petitioner and his mother, Dr. White formed the opinion that petitioner came from a dysfunctional family that had a profound genetic vulnerability to mental illness and substance abuse. Petitioner had attentional problems that affected his ability to learn, and had substance abuse problems. Throughout the time petitioner was growing up, the family was under profound stress because his parents were of different races and he experienced severe psychological and physical abuse while growing up. These factors affected his behavior and functioning throughout his childhood and into adulthood.

I. *Which members of petitioner's family and which friends of petitioner and his family did counsel interview; when did he do so; what potentially mitigating information did he obtain during such interviews; and, if he did not conduct such interviews, what potentially mitigating evidence would such interviews have uncovered?*

*Findings*: "Shinn personally did not interview any witnesses as to their testimony except immediately prior to their taking the witness stand.

"Shinn did direct investigator Payne to confer with Petitioner and obtain the names of family or friends who should be interviewed. This occurred

---

[21]This testimony, like that of Don Anderson, would not have been admissible at the penalty phase.

during the guilt portion of the trial and immediately after the return of the jury's verdict in the guilt phase of the trial.

"Had Shinn located witnesses and conducted interviews, the information described in the answer to Question [H], *supra*, would have become known to him."

*Exceptions*: Petitioner excepts to the implication in the report that Shinn directed his investigator to obtain the names of penalty phase witnesses before the return of the guilt phase verdicts. He also excepts to the referee's exclusion, on hearsay grounds, of his exhibit No. 57, comprised of declarations by friends and family members of petitioner, which would have set forth in more detail the mitigating evidence Shinn could have obtained.

While there is no direct evidence that Shinn instructed Payne to locate potential penalty phase witnesses prior to May 31, 1985, the date on which petitioner was found guilty of murder, the evidence establishes that Payne was aware that this task was among his responsibilities and that he did not wait until the guilty verdict was returned to begin to identify such witnesses. Payne testified that his job with regard to the penalty phase was to meet and confer with petitioner to review and compile a list of witnesses petitioner wanted to present. He and Shinn discussed the witnesses that were going to be needed long before the penalty phase began, as there was no question that they were probably going into a penalty trial.

The guilt phase of the trial ended on June 4, 1985. The penalty trial commenced on June 24, 1985. The penalty verdict was returned on July 3, 1985. By prearrangement with Shinn, Payne left on vacation on June 27 or 28. Payne's testimony does not identify any witness actually interviewed before the end of the guilt phase of the trial although he stated that he had done everything in his power to locate or identify all of the potential penalty phase witnesses by that time.

The witnesses who had been subpoenaed for and those who actually testified at the penalty phase testified, however, that neither Payne nor Shinn interviewed them prior to that part of the trial, although Shinn spoke briefly to some witnesses just before they were called to the stand. Claudette Barber, who testified at the penalty phase, did not remember talking with Shinn and testified that she had no preparation before taking the stand. She had no idea what kinds of questions were to be asked. She recalled only that someone told her she would be next and would be asked some "general questions." Richard Kelley, a penalty phase witness, did not talk to either Shinn or Payne before he testified. Payne's notes do not reflect interviews

with the witnesses he identified and do not include interview reports that Shinn might have reviewed.

The declarations which the referee excluded from evidence at the evidentiary hearing are, as the referee ruled, hearsay. Petitioner contends that they were admissible nonetheless. He argues first that an adequate foundation was laid inasmuch as they were identified by the investigator who obtained them and who testified regarding the manner in which they were obtained and because they were relied on by Dr. White for her opinion. He also argues that they were admissible not for their truth, but for the nonhearsay purpose of demonstrating what potentially mitigating evidence was available.

The referee did not err. The declarations are hearsay. (Evid. Code, § 1200.) Some are multiple hearsay as to which no exceptions to the hearsay rule apply. (Evid. Code, § 1201.) The adequacy of the foundation laid for their admission does not bring the declarations within any exception to the hearsay rule. They cannot be considered for the purpose of showing what evidence that might have been considered mitigating by the jury at the penalty phase was available unless they are considered for their truth.

The record does establish that petitioner has located numerous persons who were not interviewed by Shinn or Payne and who claim to have knowledge of petitioner's background. Petitioner did not call those witnesses at the evidentiary hearing, however. Admitting their statements in the form of declarations would have denied respondent the opportunity to cross-examine the declarants regarding their statements and assertions that they would have testified.

The testimony of other witnesses confirms, however, that a substantial amount of potentially mitigating evidence was available from numerous sources that were not investigated or interviewed by Shinn. Two such persons, Richard DeLouth and David Willoughby, who had known petitioner as a child and were familiar with the physical abuse he suffered and the impact on him of his mixed-race background, did testify at the evidentiary hearing. Richard DeLouth had known petitioner since the end of 1971 when he had lived only two houses from the Gay home. They were neighbors for five or six years during which time they were very good friends and saw each other on a daily basis. He had observed others, both Black and White, taunting petitioner about his racial makeup, calling petitioner a "half breed" and "half a nigger." He himself had teased petitioner about his slight stature. He also testified about petitioner's use of marijuana and alcohol and his sniffing of paint and glue while in junior high school, and about Van Gay, petitioner's father, using marijuana in petitioner's presence. He and petitioner had stolen marijuana from another neighbor.

DeLouth had never known petitioner to fight, but on one occasion when petitioner was being taunted but did not want to fight, Van Gay came out of the house and ordered petitioner to "fight like a man." Petitioner was seen as an easy target because he did not like to fight and was picked on for that reason by other people. DeLouth testified that he knew both Gail Beasley and Marsha Holt, trial witnesses, had sold drugs to them, and had been with them when they used drugs. He had known Raynard Cummings for several years before he met petitioner. He had witnessed violent acts by Cummings when Cummings played on a Little League baseball team with DeLouth's brother. DeLouth was very surprised that petitioner and Cummings were friends later because he knew Cummings's temper and violence.

David Willoughby had known petitioner since 1967. His home in Pacoima had been seven houses from that occupied by the Gay family. He was then four years old and remained a neighbor for nine years. Willoughby was a good friend of petitioner's younger brother Steven, and was at the Gay house several times a week. He became friends with petitioner also and both ate and spent the night in the Gay home. He witnessed Van Gay beating petitioner at least 10 times, and at other times from the street heard yelling and screaming in the home. When Van Gay was at home the atmosphere in the house would be tense and nervous. He did not enjoy being at the house when petitioner's father was there because Van Gay was always yelling at the children or beating petitioner. Van Gay was moody and they never knew what his mood would be.

Willoughby saw Van Gay drunk almost every day. When he was drunk he became "meaner," and hit the children if something wasn't done or they talked back. He hit petitioner more often than the other children, frequently calling him an "asshole," or "f—ing asshole." Petitioner was beaten for things he had not done. Van Gay usually hit petitioner with his hands, but Willoughby saw him hit petitioner in the front yard with a golf club and also saw him use a leather belt. Willoughby saw bruises, hand prints on petitioner's face, "busted" lips, and black eyes on petitioner from the beatings. When Van Gay used the golf club to strike petitioner he swung it with full force as if he was swinging a bat. He hit petitioner twice. Petitioner screamed and asked his father to stop when the belt was used. When he was being beaten, petitioner would cower and roll into a ball to block the blows. This seemed to make Van Gay angrier. On one occasion petitioner appeared to be on the verge of passing out during a beating. Petitioner's mother had objected and Van Gay had begun to strike her. Petitioner and Steven then attempted to intervene. Van Gay threw petitioner through a doorway into the bedroom and hit him until petitioner, who had crawled onto the bed, appeared to be dazed. Petitioner weighed about 115 pounds, Van Gay about

200 pounds. Willoughby testified that he had also seen marks from beatings on Steven and on petitioner's sister Dorrie.

Willoughby had heard comments about petitioner and name calling by neighbors, both children and adults, who referred to petitioner as "half breed" and "honky." He had also seen petitioner beaten in a fight because of his mixed race. One parent told his son that he did not want his son playing with a "half breed kid" and goaded his son to fight petitioner, who was beaten up in the ensuing fight. None of the other people around the fight attempted to stop it. Instead they goaded it on. Every Friday at their junior high school was called "Patty's Day." On that day the Black students beat up the White and mixed-race students and the Mexican students. He knew that petitioner had been beaten up on Patty's Day. When petitioner said he was tired of going to that school, petitioner's father told petitioner that he had to learn how to fight and stop acting like a wimp.

Willoughby, too, testified about Van Gay's open use of marijuana, and about petitioner's substance abuse as a child.

*J. Which potential witnesses, if any, did petitioner tell trial counsel he did not want to testify? Which additional persons, if any, did petitioner want to call to offer mitigating evidence, and what would their testimony have been had they been called?*

*Findings*: "Petitioner did not want his siblings, his father, or his father's friends to testify. He made clear to investigator Payne that he did not want to grovel during the penalty phase of the trial. Payne did confer with Petitioner, Petitioner's mother and Shinn in an attempt to identify witnesses.

"Five witnesses who were in state prison at the trial were, at Petitioner's request and with Shinn's acquiescence, brought to Los Angeles [fn. omitted]. However, the evidence at the evidentiary hearing demonstrates that Don Anderson was the only witness which Petitioner wanted to call to offer mitigating evidence. As discussed above, Anderson was the husband of Marsha Holt, a prosecution guilt phase witness. Petitioner wanted Anderson to testify as to an inconsistent statement by Holt that she had not seen the murder, contrary to her early testimony. Shinn told Petitioner that the testimony would be hearsay and not admissible.

"This Court believes investigator Payne's testimony that Petitioner's attitude during the penalty phase was 'if they want to convict me, then they can give me the death penalty.' Petitioner's desire during the penalty phase was

to continue to maintain his innocence and not give the appearance of 'sniveling or groveling for his life.' "

*Exceptions*: Petitioner excepts to the finding that he "made it clear to investigator Payne that he did not want to grovel during the penalty phase of the trial." He argues that the evidence demonstrates that he did want to put on a penalty phase defense, and cooperated with everyone involved to present a defense. He also excepts to the finding that of the five subpoenaed witnesses, he wanted only Don Anderson to give mitigating evidence. He asked that the witnesses be brought, the witnesses had potentially mitigating evidence, and it was Shinn who declined to call them. The evidence shows at most that he did not want his father and perhaps one sister to testify.

The evidence supports the referee's finding that petitioner objected to calling some family members. However, the evidence also supports petitioner's claim that he did desire to put on a penalty phase defense that included both a continued assertion of innocence and mitigating evidence about his family background and mental health. He cooperated with Investigator Payne, with Shinn, and with Weaver and McBroom in their preparation for the penalty phase. While petitioner may have indicated to Payne that he did not want to put on some types of evidence, there is no evidence that petitioner made the same statement to either Shinn or Weaver. The record satisfies us that the failure to investigate and develop available mitigating evidence is attributable in major part to Shinn's belief, shared by Weaver, that because petitioner had killed a policeman, imposition of the death penalty was a foregone conclusion. We do not foreclose the possibility that the failure is also attributable to simple incompetence unrelated to Shinn's assessment of the likelihood that the death penalty would have been imposed.

Investigator Payne testified that there were some family members whom petitioner stated he did not want exposed to the trauma of trial, and petitioner did not want to give the appearance of sniveling or groveling for his life. He did not want to go into abuse by his parents or any type of abuse, psychological or sexual, and he did not want to use his father as a witness as his father had some problems and petitioner did not believe he could control his father. Petitioner gave Payne instructions on every witness. He refused to call an older brother who was in prison and one younger sibling he felt had nothing relevant to offer. Petitioner did not want Dorrie Gay, Steven Gay, or Sharon Gay called.

Petitioner himself testified that he wanted to insist on his innocence at the penalty phase. He also testified that, although the subject did not come up,

he would have "groveled" to get a life without possibility of parole sentence. He did not tell Shinn that he did not want his father or sisters to testify.

The referee found Payne's testimony convincing. As noted earlier, since the referee has the opportunity to hear and observe the witnesses at an evidentiary hearing, we accord great deference to the referee's assessment of credibility. Nonetheless, while petitioner may have said he did not want to grovel and did indicate that some family members should not be called, the evidence does not support a conclusion that petitioner did not want to put on a defense at the penalty phase. We do not equate a desire not to "grovel" with abandonment of a penalty phase defense. Indeed, Shinn, Payne, and Weaver all testified that petitioner was cooperative and helpful in penalty phase preparation. Although petitioner did not want his father or his sister to testify, he did not put limits on other potential witnesses. His reluctance to have those witnesses called may well be explained by his father's mental deterioration and erratic behavior and by his sister's schizophrenia.

There is no evidence that petitioner did not want the other persons he had named to testify other than Payne's assertion that he had arranged for their removal from prison in order to give them a free ride. One, Willie Campbell, could have testified about petitioner's family.

As the findings of the referee and the evidence above reflect, Shinn's incompetent failure to marshal mitigating evidence and his use of a mental health expert who described petitioner as a sociopath with an antisocial personality, left the jury with the impression that nothing in petitioner's background contributed to his conduct or warranted sympathy.

K. *Did trial counsel have a tactical reason for introducing or displaying exhibits A, C, and D to the jury, and, if so, what was that reason?*[22]

*Findings*: "Shinn had apparent tactical reasons for utilizing Exhibits A, C and D during petitioner's trial.

"Exhibit A is a photograph of the victim police officer, Paul Verna. While it may have been displayed earlier to the jury during the prosecution's opening, Shinn chose to utilize the photograph in an attempt, as Shinn described, to shock Pamela Cummings into telling the truth about the case. Payne corroborated this explanation. Shinn explained that this was a tactic that had been utilized—albeit unsuccessfully—in the *Charles Manson* case by the defense [fn. omitted]. He had used the tactic in other cases as well.

---

[22]The exhibit designations are those used at the murder trial.

"With reference to Exhibits C and D, Shinn had little memory other than to state that he used them for 'trial tactics.'[23] These two exhibits were the written statements of prosecutor's witness Pamela Cummings and her husband co-defendant Raynard Cummings. In those statements they attempted to lay blame on both Petitioner and an uninvolved individual.

"There was no evidence adduced at the hearing as to the reason for their use by Shinn other than his proffer of 'trial tactics.' Respondent argues, however, that the statements were utilized to impeach Pamela Cummings and demonstrate the ends to which she and her husband would go to shift blame to others. This explanation is not an unreasonable one in light of the lack of evidence to the contrary."

*Exceptions*: Petitioner excepts to the finding that Investigator Payne corroborated Shinn's explanation for the use of exhibit A and to the implication that the explanation proffered by respondent can be attributed to Shinn. Finally, he excepts to the conclusion of the referee that Shinn had tactical reasons for using exhibits A, C and D at trial.

 We agree with the referee that Shinn may have had tactical reasons for using exhibits C and D.

Investigator Payne testified that he had discussed the use of trial exhibit A, the blowup photograph of Officer Verna, with Shinn. The photograph was to be used to put a face on the mannequin that had been used with rods to demonstrate the path of the bullets. Shinn testified at one point that he displayed exhibit A in order to shock Pamela Cummings into telling the truth, and at another that he felt that other exhibits were not going to leave a lasting impression on the jurors. The photo had been a prosecution exhibit that had been on display but was not used.

Petitioner argues that Shinn's explanation that he used exhibit A in an attempt to shock Pamela Cummings into telling the truth about the murder is belied by the record. At the time Shinn introduced exhibit A, he was cross-examining Raynard Cummings during trial of the robbery counts, and at that point was precluded from cross-examining Pamela Cummings about the killing because the murder trial had not begun and the mannequin had not been used.

We need not consider whether Shinn's display of the photo of Officer Verna reflected incompetence because we find no likelihood of prejudice.

---

[23]The referee observed that Shinn could not recall many substantial portions of petitioner's trial or his reasons for doing many things in representing petitioner.

This observation is also confirmed by our review of Shinn's testimony. It should be noted that Shinn was 79 years old at the time of the reference hearing and the trial had occurred 12 years earlier. He was, however, employed as a law clerk.

While the prosecution did not introduce the exhibit, the photo had been in the courtroom, visible to the jury, during the trial. Formal admission of the exhibit would not elicit perceptible sympathetic reaction that could have caused prejudice.

Shinn testified that he introduced trial exhibits C and D as "trial tactics." Exhibit C was a statement Pamela Cummings had given to the police. In the statement, Pamela blamed petitioner for the shooting. Exhibit D was a statement Raynard Cummings had given to the police. It implicated petitioner in the shooting. Petitioner fails to acknowledge, however, that both statements also falsely implicated one Milton Cook, who resembled Raynard Cummings, in the shooting. During his cross-examination Shinn brought out the fact that Pamela and Raynard had conspired to implicate Cook.

Respondent argues that the evidence supports the referee's finding that Shinn did have tactical reasons for using these exhibits. Although when first asked Shinn could not remember what the tactical bases for these actions were, he later testified that Pamela Cummings was protecting her husband during her testimony. Payne testified that defense strategy was to implicate Raynard Cummings as the person who shot Officer Verna. Petitioner himself testified that part of the strategy of the defense was to show that Pamela and Raynard Cummings had lied in their statements.

Respondent suggests that Shinn's lack of recall of the details of his representation of petitioner does not demonstrate that he actually had no tactical reason for using these exhibits, but is attributable to Shinn's age, and the 10-year interval between the trial and the habeas corpus evidentiary hearing.

Petitioner argues again that the record belies respondent's theory as to Shinn's tactical reasons for introducing exhibits C and D. He points out that when exhibit C was introduced, Pamela was being cross-examined during the robbery portion of the trial of Raynard Cummings. She had not yet testified in the murder case against petitioner. Moreover, all the evidence necessary to establish that Pamela should not be believed had already been introduced. Exhibit D not only implicated petitioner, but corroborated Pamela's later testimony. Exhibits C and D offered the only direct evidence to support the prosecutor's theory that two persons had used a single gun in the shooting.

Nonetheless and regardless of the stage of the trial at which these exhibits were introduced, we cannot discount the evidence that Shinn's purpose in introducing these exhibits was to persuade the jury that Pamela Cummings

and her husband would go to any lengths, even implicating an innocent person, in their efforts to seek acquittal of Raynard Cummings. Faced with the quantity of damning evidence against petitioner, it was not unreasonable for counsel to attempt to turn the Cummingses' statements against them in an effort to persuade the jury that Raynard Cummings alone was responsible for shooting Officer Verna.

In any event, since the jury had rejected the version of events recounted in these exhibits, their introduction would not have caused prejudice to petitioner at the penalty phase of the trial.

Finally, we consider petitioner's claim that Shinn did not develop a coherent penalty phase strategy prior to presenting his witnesses.

L. *Did Shinn formulate any penalty phase strategy prior to the trial of the penalty phase and/or to final arguments, and, if so, what was that strategy and how was it implemented?*

*Findings*: "Shinn's penalty phase strategy was formulated following the return of a guilty verdict. However, he and his investigator discussed the possibility of conviction during the guilt phase and, in light of the fact that the investigator would be on vacation during the penalty phase of the trial, Payne started work on it during the guilt phase.

"While Shinn did not recall his strategy, he stated that he always formulated one. Investigator Payne testified that the strategy was simply to produce witnesses who could testify as to Petitioner's background, to obtain doctors who had earlier observed him and anyone else that could offer mitigating evidence. The strategy was simply to put on the stand anyone who could say anything positive about the Petitioner."

*Exceptions*: Petitioner excepts to the finding that work on the penalty phase was begun during the guilt phase and to the finding that Shinn formed a strategy following the guilt verdict and that the strategy was one of putting on the stand anyone who could say anything positive about petitioner.

We conclude that it is unnecessary to resolve when Shinn developed his penalty phase strategy. As the findings above reflect, Shinn's preparation for the penalty phase was woefully inadequate. He did not conduct a thorough investigation and discover the potentially mitigating evidence that was available. He did not interview and prepare the witnesses he did present, and had decided prior to the penalty phase that much of this was unnecessary because imposition of the death penalty was a foregone conclusion.

Shinn did present some mitigating evidence about petitioner and an expert opinion that he would not be a problem in a structured setting. (See *People v. Cummings, supra,* 4 Cal.4th at pp. 1271-1272.) Although his strategic approach to the penalty phase initially sought only to offer witnesses who could say something positive about petitioner, it is apparent from his examination of Dr. Weaver and his closing argument that some strategy had evolved when the penalty phase began—an attempt to convince the jury that life in prison without possibility of parole was an appropriate penalty because evidence might someday be found to establish that petitioner was not the person who shot Officer Verna and since petitioner did well in a structured setting, he could make a positive contribution in the prison environment where his education and skills could be used to benefit other prisoners.

## V

### *Prejudice*

■ This is not a case in which there was a total breakdown of the adversarial process at the penalty phase in which prejudice may be presumed. (*United States* v. *Cronic, supra,* 466 U.S. 648, 666 [104 S.Ct. 2039, 2050-2051].) Petitioner must therefore show that Shinn's errors were so serious that they deprived petitioner of a fair penalty trial, that is, "a trial whose result is reliable." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 687 [104 S.Ct. at p. 2064].) ■ The court will grant relief on the ground that a defendant did not receive the quality of representation guaranteed by the Sixth Amendment if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* at p. 694 [104 S.Ct. at p. 2068].) Therefore, to be entitled to relief petitioner must demonstrate not only that counsel performed inadequately, but also that this inadequate representation was prejudicial, i.e., that it is probable that the jury would have returned a verdict of life without the possibility of parole had petitioner received competent representation. ■ We have concluded above that Shinn's representation of petitioner was inadequate and possibly prejudicial in several respects. We now conclude that the cumulative impact of Shinn's many failings was prejudicial and necessitates reversal of the penalty verdict.

To put the possible impact of Shinn's failings in perspective, we reiterate the summation of aggravating factors which led us to reject petitioner's incompetent counsel claim on appeal: "The circumstances of the murder, a cold-blooded, premeditated execution of a police officer for the purpose of

avoiding arrest and return to custody, was undoubtedly the most influential aggravating factor. The murder and the circumstances of its commission, considered with the evidence of Gay's assault on his former girlfriend, his commission of arson which seriously injured another former girlfriend, and his attempt to burn another jail inmate,[24] reflected the culmination of a continuing and escalating pattern of life-threatening violent conduct by Gay." (*People* v. *Cummings*, *supra*, 4 Cal.4th at p. 1343.)

The aggravating evidence included the series of armed robberies of which petitioner had been convicted and evidence of another presented at the penalty phase, the evidence of injury to several of the robbery victims who were pistol-whipped, and evidence of a threat to a jailer and the family of the jailer made by petitioner while being held in the Los Angeles County jail.[25]

Shinn's incompetence in persuading petitioner to make the statement to the investigating officers led directly to petitioner's conviction on all of the robbery counts except the repair shop, Designer Florist, and Artistic Bath counts, and to the jury's consideration of those offenses as aggravating factors. It may have contributed to his conviction on the Designer Florist count and Artistic Bath counts. It would be difficult to conclude that the jury's consideration of this number of robberies committed shortly before the murder did not weigh heavily in the penalty decision. This is particularly so because the prosecution argued that Officer Verna was killed to prevent the arrest and return of Cummings and Gay to prison, and the prosecutor reviewed the robberies and the violence connected therewith during his penalty phase argument. Had petitioner not been convicted of those robberies, that motivation argument would not have been as strong as applied to petitioner and the injuries suffered by some of the robbery victims could not have been considered as aggravating factors.

In this proceeding petitioner has also established that Shinn failed to investigate, discover, and present evidence that might have given the jury an understanding of the circumstances in his background and the triggering events that preceded the assault and the arson that the People offered as aggravating factors. Had this evidence been offered, these aggravating factors might have carried less weight with the jury, particularly when considered with the evidence that he performed well and was not a threat when in a structured setting.

---

[24]Petitioner made a torch of rolled up toilet paper and newspaper, lit it, and shoved it through the bars of a cell in the jail at another inmate's face. That inmate was able to push the torch away.

[25]Petitioner told the jailer that if petitioner "beat the case," petitioner "would come after my family and me and that cops were such bad shots we would be easy pickings."

Here, as in *Marquez, supra,* 1 Cal.4th 584, petitioner has established that potentially mitigating evidence of which counsel should have been aware was available, but was neither investigated nor offered. That evidence consisted of both petitioner's background, including the abuse to which he was subjected as a child and the problems arising out of his racial heritage, and expert testimony regarding the impact these factors had on petitioner's personality and mental health.

Petitioner has demonstrated that counsel's attempt to obtain potentially mitigating evidence regarding petitioner's mental state and its possible impact on his conduct at the time of the murder was doomed to failure from the start. When Shinn fraudulently and unethically maneuvered his own appointment to defend petitioner, petitioner lost any possibility of a fully developed penalty phase defense. (See Bus. & Prof. Code, § 6068, subd. (d).) He was saddled with an attorney who abandoned hope before any attempt to craft a penalty defense was undertaken. The apparent capping relationship between Shinn, McBroom, and Weaver led to Shinn's retention of a mental health expert who accepted only with the understanding that the case would not be complicated and would not place demands on his time. By his own admission, Dr. Weaver made no attempt to do a thorough assessment of petitioner's mental status and was uninterested in meeting then current standards of forensic psychiatry. His failure to do a thorough assessment of petitioner's mental health is as much attributable to the instructions given him by Shinn as to his own belief, which coincided with that of Shinn, that the penalty decision was a foregone conclusion because petitioner, a Black man, had killed a White police officer.

Additionally, at the time Shinn represented petitioner, Shinn labored under a second and undisclosed potential conflict of interest—he was being investigated for misappropriation of client funds by the office of the same district attorney who was his adversary in the prosecution of petitioner. Whether Shinn's failure to aggressively defend petitioner at the penalty phase of the trial is solely attributable to the conflict precipitated by the capping relationship or was influenced by the distraction of the fund misappropriation investigation cannot be determined on this record. The per se rule of prejudice arising from an actual conflict of interest does not apply therefore. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 692 [104 S.Ct. at p. 2067].) Nonetheless these conflicts contribute to our lack of confidence in the verdict when considered with Shinn's other failings.

Petitioner has established that Shinn did not personally interview potential witnesses and spoke to those he did put on the stand only briefly in the hallway outside the courtroom. Little effort was made to identify and marshal potentially mitigating penalty phase evidence.

Petitioner has also demonstrated that some of the People's aggravating evidence, the evidence that he committed several robberies, finds its source in Shinn's failure to preserve petitioner's privilege against self-incrimination in the interview with police investigators at which he persuaded petitioner to admit the commission of the robberies. While petitioner had been convicted of a heinous murder, we cannot join the assumption of his attorney and psychiatrist that imposition of the death penalty was a foregone conclusion. A substantial quantity of potentially mitigating evidence was available which the jury did not hear as a result of Shinn's incompetence.

We recognize that Weaver's penalty phase testimony did tell the jury of his conclusion that petitioner had a difficult childhood because of his mixed race, did not identify with either race, and had to fight both. He also testified that petitioner's father had abused him. His testimony did not bring out the full extent of the problems petitioner had experienced or the severity of the physical abuse to which he had been subjected.[26] Dr. Weaver's brief description of petitioner's background was not offered as a sympathetic factor or to explain his conduct at the time of the murder, but in the context of an opinion that petitioner reacted positively in a structured environment but had a sociopathic personality and should not be back on the street. Thus, to the extent that Shinn offered Dr. Weaver as part of the strategy of bringing out positive things about petitioner, he did so only to say that petitioner did not cause trouble in jail and would do well in a structured environment. Any mitigating impact of that opinion was tempered, however, by his testimony that petitioner had a sociopathic personality.

In the opinion of the trial judge who heard the witnesses, "little or no" mitigation appeared in the penalty phase evidence offered by Shinn. We agree.

We are unable to put confidence in a verdict of death rendered by a jury that reaches a death penalty verdict for a defendant represented by an attorney who has defrauded the court in seeking appointment, and whose unethical conduct led directly to the retention of a mental health expert who the attorney agreed would not be called upon to do a thorough assessment of the defendant and who testified that the defendant had a sociopathic personality. Confidence in the verdict is further undermined by counsel's incompetent conduct contributing to the penalty phase jury's consideration of

---

[26]Dr. Weaver stated that in a two-hour interview with petitioner he "found that he has started out life kind of in a very difficult setting being part black and part white and born in London, being transplanted back to Texas and then back here to L.A. with a white mother and a black father, and indeed this mitigated some of his problems which he himself felt had considerable impact on his own development. [¶] He indicated a number of times to me that he felt like he didn't have any relationship, any identification. He was not white and he wasn't black. He sometimes had to fight the blacks and sometimes had to fight the whites. . . . [¶] . . . [H]e had been abused by his father as a child . . . ."

evidence that the defendant is a serial robber with a sociopathic personality, and by recognition that the jury did not have the opportunity to consider a substantial amount of mitigating evidence that competent counsel would have presented. We conclude there is a reasonable probability that absent counsel's numerous failings and the conflicts of interest with which he was burdened, a different penalty verdict would have been reached.[27] We do not, therefore, have confidence in the penalty verdict reached in this case.

## VI

### *Disposition*

The petition for writ of habeas corpus is granted. The judgment is vacated insofar as the penalty of death is imposed. Petitioner is remanded to the custody of the Sheriff of the County of Los Angeles (see § 1493) to be held pending retrial of the penalty phase of the prosecution of petitioner for murder in People v. Raymond Paul Cummings and Kenneth Earl Gay, No. A392702.

Respondent shall cause notice of the writ to be served on the District Attorney of the County of Los Angeles upon the finality of this opinion. (See § 1382, subd. (a)(2).) Should petitioner not be granted a new penalty trial within the time specified in section 1382 or any continuances granted by the superior court, the court shall impose the penalty of life without the possibility of parole.

Mosk, Acting C. J., Chin, J., Brown, J., and Peterson, J.,* concurred.

**MOSK, Acting C. J.**—I concur in the opinion of the court prepared by Justice Baxter.

I write separately to note that, on appeal, I would have reversed, in its entirety, the judgment entered against petitioner Kenneth Earl Gay, including the sentence of death. Even though I was then unable to look beyond the face of the record, I was nevertheless of the opinion that the

---

[27]An assessment of prejudice requires knowledge of the trial evidence, not just the evidence offered at the evidentiary hearing. (*Marquez, supra*, 1 Cal.4th at p. 604.) For that reason, we did not ask the referee to make any finding or recommendation regarding prejudice. As this court has thoroughly reviewed the trial court proceedings in conjunction with the appeal, we are better able to make the assessment of prejudice.

*Retired Presiding Justice, Court of Appeal, First District, Division Five, originally assigned, pursuant to article VI, section 6 of the California Constitution, by former Chief Justice Malcolm M. Lucas, in conjunction with the issuance of the order to show cause, and reassigned by the Acting Chief Justice upon Justice Peterson's retirement.

"failings of Gay's counsel," the subsequently disbarred Daye Shinn, "were 'pervasive and serious,' and 'resulted in a breakdown of the adversarial process at trial' "; that " 'that breakdown establishe[d] a violation of [Gay's] . . . right to the effective assistance of counsel' " under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution; and that " 'that violation mandate[d] reversal of the judgment even in the absence of a showing of specific prejudice.' " (*People v. Cummings* (1993) 4 Cal.4th 1233, 1344 [18 Cal.Rptr.2d 796, 850 P.2d 1] (dis. opn. of Mosk, J.), quoting *People* v. *Visciotti* (1992) 2 Cal.4th 1, 84 [5 Cal.Rptr.2d 495, 825 P.2d 388] (dis. opn. of Mosk, J.).)

Now that I am able to extend my gaze, I am of the same opinion a fortiori. For presently I know what formerly I could only suspect, albeit on the strongest of evidence. As we observe time and again in the opinion of the court, Shinn believed that a verdict of death was a "foregone conclusion." He acted—or better, *failed* to act—accordingly.

In view of the above, I fully, and necessarily, agree that we must—at the very least—set aside the sentence of death, and that we must do so because Shinn's nonperformance was—again at the very least—prejudicially deficient in that regard.

**WERDEGAR, J.**—I concur in the judgment, for the reasons that follow.

In response to petitioner's petition for writ of habeas corpus challenging the judgment and sentence in his capital case on grounds, inter alia, of ineffective assistance of counsel, this court issued an order to show cause limited to the question whether petitioner received constitutionally ineffective assistance by trial counsel at the penalty phase of the trial. The majority concludes counsel's representation was inadequate and likely prejudicial, thus requiring reversal of the penalty verdict. I agree the death penalty imposed on petitioner cannot stand. Because, however, I believe the attorney who represented petitioner suffered from impermissible conflicts of interest in his preparation for and presentation of petitioner's penalty phase case, I find it unnecessary to consider petitioner's other claims of inadequate representation or the question of prejudice.

A criminal defendant's right to effective assistance of counsel, guaranteed by both the federal and state Constitutions, includes the right to representation free from conflicts of interest. To establish a violation of this right under the state Constitution, a defendant need only show the record supports an "informed speculation" that counsel's representation was adversely affected

by the claimed conflict of interest. (*People* v. *Sanchez* (1995) 12 Cal.4th 1, 45 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1009 [30 Cal.Rptr.2d 818, 874 P.2d 248].) Here, the evidence shows trial counsel failed in his duty of diligent and loyal representation, placing his own interests before his client's, thereby affording petitioner substandard assistance in his trial on penalty.

As the referee found and the majority opinion explains, petitioner's trial attorney, Daye Shinn, substituted in for the public defender as retained counsel and eventually obtained his court appointment by lying first to petitioner and then to the court about payment of his fees. He was aided in this scheme by psychologist Marcus McBroom and, in apparent return for that assistance, retained McBroom's associate, psychiatrist Fred Weaver, as his principal penalty phase witness. Dr. Weaver, in turn, employed McBroom—who was not licensed in California—to perform psychological testing on petitioner, as he had previously done in other criminal cases. As the majority states, this set of transactions, which included fraud on both the client and the court, amounted to a type of unethical capping arrangement. (Maj. opn., *ante*, at pp. 781, 794-796, 828.)

Why did Shinn expend such effort, and cross the borders of honesty and ethics, to obtain appointment in this case? Was it because he believed petitioner deserved the best prepared, most vigorous defense possible, and believed himself, together with Dr. Weaver, especially able to provide such a defense? Unfortunately, we know that was not the reason. Shinn's own planning and preparation for the penalty trial were slight, and, consistent therewith, he instructed Dr. Weaver to undertake only a routine evaluation of petitioner, conveying to Weaver his view the death penalty was a foregone conclusion. (Maj. opn., *ante*, at pp. 796-800, 807-813, 817-821.) I thus can infer only that Shinn sought appointment in this case to meet his own personal needs, presumably financial, and that he intended to—and did—exploit the appointment to meet those personal needs, rather than to represent his client as well as possible.

My conclusion as to Shinn's self-serving intent and motive is reinforced by the fact that, at the time he was representing petitioner, Shinn labored under another conflict of interest, one raising criminal liability and professional, as well as financial, concerns. The Los Angeles County District Attorney's office, the office that was prosecuting petitioner, was at the same time also actively investigating a complaint from one of Shinn's civil clients that Shinn had misappropriated about $180,000 from a recovery obtained for the client. During this period, therefore, Shinn was under pressure not only of criminal and State Bar disciplinary action (eventually, he was disbarred

for his misappropriation and other violations concerning this civil client), but was also faced with the likelihood he would have to make large-scale restitution to the client (as he, in fact, later did). Indeed, Shinn's own pending criminal investigation may help explain why he was so anxious to cooperate with the district attorney that he induced petitioner to confess to several robberies—robberies used in aggravation of penalty—without demanding or receiving any assurances the admissions would not be used against petitioner. (See maj. opn., *ante*, at pp. 791-793.)

I recognize that a court-appointed defense attorney's interest in compensation does not, per se or in general, conflict with the attorney's duty to represent his or her client loyally and diligently. (See, e.g., *People* v. *Kirkpatrick*, *supra*, 7 Cal.4th at pp. 1009-1010.) Here, however, the appointed attorney had previously misappropriated large amounts of money from another client and, as a result, was under threat of losing his livelihood, suffering criminal prosecution, and having to repay the money. Against this background, the attorney engineered his appointment in a capital case, doing so by extraordinary, dishonest means, and for the apparent purpose of quickly obtaining a fee while expending as little time and effort on the case as possible. The attorney carried out his plan by strictly limiting the amount of background investigation and psychological evaluation he authorized his expert to consider or undertake, and generally by preparing and presenting only a rudimentary case in mitigation. This case is not an ordinary one.

In deceitfully obtaining appointment simply for the purpose of making money, Shinn placed his own interests ahead of petitioner's, for under these circumstances petitioner would likely have been better off had he continued to be represented by the public defender's office; certainly he had an interest in making that choice free of misrepresentation by his prospective appointed attorney. In short, these circumstances provide grounds, at the least, for "informed speculation" (*People* v. *Kirkpatrick*, *supra*, 7 Cal.4th at p. 1009) that counsel's conflicts of interest adversely affected his penalty phase performance on petitioner's behalf. Cruel and inexcusable as was petitioner's crime, he was entitled to an attorney who would try to serve, first and foremost, the interests of his client at the penalty phase, instead of the attorney's own. Whether petitioner would have been sentenced to death even with a loyal and dedicated defense attorney we cannot know, nor need we try to decide. Regardless of whether, as the majority concludes, the penalty trial's outcome was likely altered by counsel's deficient performance, to

execute a death judgment tainted by such conflicted representation would undermine, rather than advance, society's quest for the just punishment of crime.

Kennard, J., concurred.